1    is suitable or should be required to be licensed as a key person or key person business entity.

2    Moreover, officers, directors and some key employees of the Debtors (and any successor entity)

3    must file applications with, and be licensed by, the Missouri Gaming Commission. The Debtors

4    are required to submit detailed financial and operating reports, similar to what is required in

5    Nevada.    Substantially all material loans, leases, sales and securities and similar financing

6    transactions by the Debtors must be reported to the Missouri Gaming Commission.

7        If it were determined that the Debtors violated the Missouri Gaming Law, their license to

8    operate the Missouri Casino Companies could be limited, conditioned, suspended or revoked. In

9    addition, the Debtors and persons involved could be subject to substantial fines. The Missouri

10   Gaming Commission could then appoint a supervisor and establish limitations and conditions, or

11   suspend the Debtors' license.    The Missouri Gaming Commission might also appoint a

12   supervisor, which would materially and adversely affect the Debtors' operations and the

13   respective operations of its successor entities.

14       Any beneficial holder of the Debtors' voting securities, regardless of the amount held, or

15   any equity holder may be required to file an application, be investigated and have his or her

16   suitability determined by the Missouri Gaming Commission. The applicant must pay all costs of

17   investigation incurred by the Missouri Gaming Commission.

18       Neither the Debtors' gaming licenses nor any interest in such licenses may be pledged,

19   hypothecated or transferred in any way.    In the event of a change in control of any Debtors

20   without the approval of the Missouri Gaming Commission, the change of control would be void,

21   and the Missouri licenses may become null and void.[37]

22       All of the foregoing requirements would also apply to any acquirer, provided that further

23   requirements may also be imposed on such acquirer.    Such requirements could be more

24   burdensome for the successor entities than the requirements that currently apply to the Debtors.

25   _____

26   [37] The Debtors may not make a public offering of securities without notification to, and potential approval by, the
Missouri Gaming Commission.    The Missouri Gaming Commission must be given 15 days notice and an
opportunity to reopen the licensing hearing in connection with various transactions, including (i) any issuance of an
27   ownership interest in the Debtors if such issuance will involve 5% or more of the outstanding ownership interests;
(ii) any private incurrence of debt equal to or exceeding $1 million by the Debtors; (iii) any public issuance of debt
28   by the Debtors, or (iv) certain transactions between a Debtor and a "related party."

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

93

E.    **Expectations With Regard To Gaming Regulatory Approval.**

　　1.    **Nevada.**

Changes in control of Herbst Gaming through merger, consolidation, stock or asset acquisitions, management or consulting agreements, or any act or conduct by a Person whereby that Person obtains control (including foreclosure on pledged shares), may not occur without the prior approval of the Nevada Gaming Commission. As such, the restructuring and the changes in ownership and control as provided in the Plan will require prior approval and licensing.[38]

Furthermore, the Nevada Gaming Commission normally requires the stockholders, officers, directors and other persons having a material relationship or involvement with the entity proposing to acquire control, to be investigated and licensed as part of the approval process.

With regard to the proposed restructuring of Herbst Gaming and the Surviving Entities, the following Persons will be subject to the investigatory and licensing process pursuant to the Nevada Act:

　　　　A.    Certain officers and directors of each of the Surviving Entities who would assume their responsibilities and roles on the Substantial Consummation Date;

　　　　B.    Key employees of the Surviving Entities as of the Substantial Consummation Date; and

　　　　C.    The parties in interest and all other Persons who will acquire any Equity Interests in the Surviving Entities, including HGH LLC.[39]

The time and manner of any investigation or action on the applications is within the sole and absolute discretion of the Nevada Gaming Authorities. Throughout the application process, the applicant must update his or her application as circumstances change, and provide full information about the Plan, including information concerning material loans, leases, sales of

---

[38] Similarly, a trustee's ability to foreclose upon the pledged shares and other gaming collateral comprising gaming businesses is limited. Regulations of the Nevada Gaming Commission provide that no person may acquire an interest in a gaming licensee or enforce a security interest in the stock of a corporation which is the holder of a gaming license or which owns stock in such a corporation without the prior approval of the Nevada Gaming Commission. As such, neither the trustee nor any holder is permitted to operate or manage any gaming business or assets unless such person has been licensed under applicable law for such purpose.

[39] As preliminarily referenced herein, different rules may apply to a registered corporation, such as HGH, LLC. However, any possible exemptions from mandatory licensing for any equity holders based on such registered corporation status should be individually discussed with Nevada gaming counsel.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

1   securities, and any similar transaction that has an impact on the Plan.

2        Entities seeking to acquire control or ownership of a registered corporation must meet a

3   variety of stringent standards of the Nevada State Gaming Control Board and Nevada Gaming

4   Commission.   Whether any acquisition is approved by the Nevada Gaming Authorities is

5   completely discretionary with them and is based on a variety of factors, including any moral risk,

6   reputational risk, or financial risk presented to the licensees, to the future licensed acquirer of the

7   licensees, the gaming industry as a whole and the State of Nevada. The transfer of any gaming

8   devices from those entities that currently own the same will also require their own separate

9   administrative approvals by Nevada Gaming Authorities.

10       Upon their licensing, the Surviving Entities and likely all of their holders of Equity

11  Interests and Persons having material associations with the Surviving Entities will be subject to

12  the same or substantially the same regulations as Herbst Gaming currently faces.  They will also

13  be subject to a costly and time-consuming investigatory, licensing, and approval process prior to

14  the Substantial Consummation Date.

15       **2.    Iowa.**

16       The expectations regarding approval by the Iowa Gaming Commission are substantially

17  similar in all materials respects to the expectations discussed above regarding Nevada.

18       **3.    Missouri.**

19       The approvals and requirements of the Missouri Gaming Commission as to licensing, key

20  persons, key person business entities, and change of control will be substantially similar to that

21  in Nevada stated above.

22  **F.    Regulatory Risks Associated With Any Creditors' Involvement Prior To Licensing.**

23       Creditors cannot be involved in the Debtors' casino operations or slot operations before

24  receipt of final regulatory approval from the Gaming Authorities, unless those Creditors are able

25  to apply for and  successfully receive in advance an interim  emergency  approval from the

26  Gaming Authorities for  such involvement while their applications are pending.  Such emergency

27  approval can be very difficult to obtain, as it requires detailed filings and demonstration of

28  special circumstances.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

95

Any involvement in the Debtors' casino operations or slot operations by Creditors, when it occurs prior to receipt of final regulatory approval or without receiving such interim emergency approval, could result in regulatory violations (as well as potential criminal sanctions) on the part of the Debtors and on the part of those Creditors who undertake such involvement. For example, usurping control of the board of directors or management of Debtors prior to the Substantial Consummation Date and without successfully obtaining interim approval or the requisite final regulatory approval from Gaming Authorities could constitute a prohibited change of control. Accordingly, any and all involvement in Debtor's operations prior to licensing (or following licensing) should always be first discussed with local gaming counsel and expressly authorized by Gaming Authorities, when so directed by gaming counsel following such consultation.

G.    **Summary Of The Gaming Regulatory Risks Under The Plan.**

1.    The Debtors are subject to extensive state and local regulation in every jurisdiction in which they do business.

2.    The substantial consummation of the Plan and the events and restructuring to take place on or after the Substantial Consummation Date are conditioned upon costly and time-consuming licensing procedures described herein, and there is no assurance that the required approvals will be obtained on a timely basis, even if pursued in good faith and with due diligence.

3.    The Debtors and the Creditors have not determined the number, position or identity of the Persons who will need to be investigated and licensed, and any discussions herein regarding the same are generic in nature.

4.    The Debtors and the Creditors have not investigated or inquired into the suitability of any Person for licensing purposes. If any Person is found unsuitable, the remaining applicants must sever their connections and relationships with the unsuitable Person and cannot allow such Person, among other things, to exercise any voting rights or receive any distributions from any of the applicant entities. A Person who continues to associate with a licensed entity after a finding of unsuitability may be guilty of a criminal offense.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

96

5.    Licenses that are currently held are not transferable to successor entities. Even if an individual has been previously licensed or found suitable with a Debtor entity, he or she will need to reapply to be licensed or found suitable in connection with any newly-created entities that apply for gaming licenses. There is no guarantee that such licenses will be issued or findings of suitability received.

6.    The burden and costs of proving suitability are on each individual applicant. There is no assurance that all of the Persons who will need to be investigated and found suitable will cooperate in this regard or be licensed or found suitable on a timely basis.

7.    Waivers from licensing requirements are often unavailable. Even when they are available, they may be difficult to obtain. A waiver from a licensing investigation requires an application for a waiver (such as an application for waiver as "institutional investor"), which is itself investigated and must be approved by Gaming Authorities before the waiver can be effective.

8.    There is no assurance that all of the required findings of suitability, licenses and approvals to substantially consummate the Plan will be obtained. Gaming Authorities may deny an application for any cause they deem reasonable and such denial is normally not subject to judicial review.

9.    There is no assurance as to the timing of the licensing process. Such timing is within the sole discretion of the Gaming Authorities. Each jurisdiction will establish its own timing. As such, there can be no assurance whatsoever that the Substantial Consummation Date will occur within one (1) year from the Effective Date or at any other time soon thereafter.

10.    There is no assurance as to the potential changes in gaming regulations that any jurisdiction may later adopt or any license conditions that any jurisdiction may impose for any of the participants in the restructuring should licensing be obtained.

11.    Any effort to usurp control of the Debtors' operations, including any attempted influence over the Debtors' operations or any unauthorized sharing in the Debtors' gaming revenues, prior to final approval and licensing of the successor entities and of all relevant Persons associated with the successor entities, unless emergency approval is obtained in advance,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

97

1    could be viewed as a violation of gaming laws and could result in regulatory and criminal

2    sanctions.

3         12.    Even if the necessary licenses, approvals, registrations, and findings of suitability

4    are secured, Gaming Authorities have wide discretion in disciplining any licensee.    Such

5    discipline may include substantial fines and revocation of licenses.    Gaming Authorities have

6    wide discretion in determining what constitutes a violation and the amount of fines that may be

7    imposed. Any taxes administered by Nevada Gaming Authorities that are not paid by Debtors (or

8    unpaid gaming winnings) could also be assessed on the Successor Entities.

9         13.    The continuity of gaming operations in any jurisdiction depends on the political

10   will of the local authorities and the respective state legislatures.    The Debtors cannot guarantee

11   that gaming will not be phased out in any jurisdiction where it is currently legal.

12        14.    The legalization and introduction of gaming activities in any neighboring

13   jurisdictions or in any feeder markets, such as the opening of additional tribal casinos, or the

14   introduction of additional commercial casinos in or adjacent to the jurisdictions where the

15   Debtors' operations are currently located, could adversely affect the Debtors and the successor

16   entities.

17                                      **XI.**
                      **CERTAIN SECURITIES LAW CONSIDERATIONS**

18        Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under

19   a plan of reorganization from registration under section 5 of the Securities Act and state

20   securities laws if three principal requirements are satisfied: (i) the securities must be offered and

21   sold under a plan of reorganization and must be securities of a debtor, of an affiliate participating

22   in a joint plan with a debtor, or of a successor to a debtor under the plan; (ii) the recipients of the

23   securities must hold claims against or interests in a debtor; and (iii) the securities must be issued

24   in exchange (or principally in exchange) for the recipient's claims against or interests in a debtor.

25        The Debtors believe that the offer and sale of the Reorganized Herbst Gaming New

26   Common Equity and Reorganized Herbst Gaming Senior Notes (collectively, "Plan Securities")

27   under the Plan will satisfy the requirements of Section 1145(a)(1) of the Bankruptcy Code and

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

98

1   the Plan Securities will, therefore, be exempt from registration under the Securities Act and state

2   securities laws.

3       To the extent that the Plan Securities are issued under the Plan and qualify under Section

4   1145(a)(1) of the Bankruptcy Code, they may be resold by the holders thereof without

5   registration unless, as more fully described below, the holder is an "underwriter" with respect to

6   such securities.

7       Generally, Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any

8   person who: (i) purchases a claim against, an interest in, or a claim for an administrative expense

9   against, the debtor, if such purchase is with a view to distributing any security received in

10  exchange for such claim or interest; (ii) offers to sell securities offered under a plan for the

11  holders of such securities; (iii) offers to buy such securities from the holders of such securities, if

12  the offer to buy is (a) with a view to distributing such securities; and (b) under an agreement

13  made in connection with the plan, the consummation of the plan, or with the offer or sale of

14  securities under the plan; or (iv) is an "issuer" with respect to the securities, as the term "issuer"

15  is defined in section 2(a)(11) of the Securities Act.  Under section 2(a)(11) of the Securities Act,

16  an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or

17  any person under direct or indirect common control with the issuer.

18      To the extent that Persons who receive Plan Securities pursuant to the Plan are

19  "underwriters" as defined in Section 1145(b)(1) of the Bankruptcy Code, resales by such Persons

20  would not be exempted by Section 1145 of the Bankruptcy Code from registration under the

21  Securities Act or applicable state securities laws.  Such Persons would be permitted to resell such

22  Plan Securities without Securities Act registration if they are eligible to rely on Rule 144

23  promulgated by the SEC under the Securities Act ("Rule 144").  However, Rule 144 would not

24  be available to an "underwriter" if current information regarding the issuer is not publicly

25  available, and the Debtors do not know if current information will be publicly available

26  regarding the issuer of Plan Securities, namely Reorganized Herbst Gaming.

27      Any person who is an "underwriter" (under Section 1145(b)(1) of the Bankruptcy Code),

28  but not an "issuer" (under section 2(a)(11) of the Securities Act), with respect to Plan Securities

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

99

would be entitled to engage in exempt "ordinary trading transactions" with respect to Plan Securities under Section 1145(b) of the Bankruptcy Code. However, the Bankruptcy Code does not define "ordinary trading transactions" and the staff of the SEC has indicated that the issuer of Plan Securities might have to be subject to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "1934 Act"), in order for the "ordinary trading transactions" exemption to be available. The Debtors do not know if Reorganized Herbst Gaming, the issuer of Plan Securities, will be subject to the 1934 Act reporting requirements.

Whether any particular Person would be deemed an "underwriter" or "issuer" with respect to any Plan Securities would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any particular Person receiving Plan Securities would be an "underwriter" or an "issuer."

**Given the highly complex and subjective nature of the question of whether a particular Person may be an "underwriter" or "issuer," the Debtors make no representation concerning the right of any Person to transfer any Plan Securities. The Debtors recommend that potential recipients of Plan Securities consult their own counsel as to whether they may transfer any Plan Securities without registration under the Securities Act or state securities laws.**

## XII.
## POST-SUBSTANTIAL CONSUMMATION DATE OPERATIONS

### A.    Title To Property; Discharge; Injunction.

#### 1.    Vesting of Assets.

Subject to the provisions of the Plan, the Assets will be transferred to and by the Reorganized Debtors and Reorganized Herbst Gaming on the Substantial Consummation Date. On and after the Substantial Consummation Date, the Reorganized Debtors and Reorganized Herbst Gaming may operate their businesses and may use, acquire, and dispose of property and compromise or settle any Claims without supervision of, or approval by, the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

**2.     Preservation of Litigation Claims.**

In accordance with Section 1123(b)(3) of the Bankruptcy Code, and except as expressly provided in the Plan, all Litigation Claims will be transferred to the Reorganized Debtors and Reorganized Herbst Gaming.  The Reorganized Debtors and Reorganized Herbst Gaming, as the successors in interest to the Debtors and the Estates, will have the exclusive right to enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Litigation Claims, including any and all derivative actions pending or otherwise existing against the Debtors as of the Substantial Consummation Date.

**3.     Settlement of Litigation Claims.**

At any time after the Confirmation Date and before the Substantial Consummation Date, the Debtors may settle any or all of the Litigation Claims with the approval of the Bankruptcy Court pursuant to Bankruptcy Rule 9019.   After the Substantial Consummation Date, the Reorganized Debtors and Reorganized Herbst Gaming will have the exclusive right to compromise and settle any Claims against them and claims they may have against other Persons, including the Litigation Claims and any and all derivative actions pending or otherwise existing against the Debtors as of the Effective Date, without notice to or approval from the Bankruptcy Court.

**4.     Discharge.**

On the Effective Date the Debtors will be discharged from all Claims in Class 1, Class 2 and Class 4 to the fullest extent provided in Sections 524 and 1141 of the Bankruptcy Code.  On the Substantial Consummation Date, the Debtors will be discharged from any and all Claims and Equity Interests, including those in Class 3, Class 5, Class 6, Class 7, Class 8 and Class 9 to the fullest extent provided in Sections 524 and 1141 of the Bankruptcy Code.  The discharge will be to the fullest extent provided under Section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order.  Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date as to Claims in Class 1, Class 2 and Class 4, and on the Substantial Consummation Date as to Claims in Class 3, Class 5, Class 6, Class 7, Class 8 and Class 9, the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101

101323-003/716183v.2

1 Debtors, and each of them, will be deemed discharged and released to the fullest extent provided

2 under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims of any kind or

3 nature whatsoever, including demands and liabilities that arose before the Confirmation Date,

4 and all debts of the kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

5     **5.**    **Compromise and Settlement.**

6     The allowance, classification and treatment of all Allowed Claims and Equity Interests

7 and their respective distributions and treatments under the Plan take into account or conform to

8 the relative priority and rights of the Claims and Equity Interests in each Class in connection

9 with any contractual, legal and equitable subordination rights relating thereto, whether arising

10 under general principles of equitable subordination, Section 510(c) of the Bankruptcy Code, or

11 otherwise, including the subordination provisions of the Indentures.  As of the Effective Date or

12 the Substantial Consummation Date, as the case may be, all such rights described in the

13 preceding sentence will be settled, compromised and released pursuant to the Plan.  In addition,

14 the allowance, classification and treatment of Allowed Claims take into account any Causes of

15 Action, whether under the Bankruptcy Code or otherwise under applicable law, that may exist (i)

16 between the Debtors on the one hand, and the Releasing Parties on the other hand, and (ii) as

17 between the Releasing Parties (to the extent set forth in the Third Party Release, as defined in

18 Section XII.A.7 below).  As of the Effective Date or the Substantial Consummation Date, as the

19 case may be, any and all such Causes of Action will be settled, compromised and released

20 pursuant to the Plan.  The Confirmation Order will approve the releases by all entities of all such

21 contractual, legal and equitable subordination rights or Causes of Action against each such

22 Releasing Party that are satisfied, compromised and settled in this manner.

23     **6.**    **Injunction.**

24     From and after the Substantial Consummation Date, and except as provided in the Plan

25 and the Confirmation Order, all entities that have held, currently hold or may hold a Claim or

26 Equity Interest or other right of a Holder of an Equity Interest will be permanently enjoined from

27 taking any of the following actions on account of any such Claims or terminated Equity Interests

28 or rights:  (i) commencing or continuing in any manner any action or other proceeding against

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

102

1   the Reorganized Debtors and Reorganized Herbst Gaming, or their respective property; (ii)

2   enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or

3   order against the Reorganized Debtors and Reorganized Herbst Gaming, or their respective

4   property; (iii) creating, perfecting or enforcing any Lien or encumbrance against the Reorganized

5   Debtors and Reorganized Herbst Gaming, or their respective property; (iv) asserting a setoff,

6   right of subrogation or recoupment of any kind against any debt, liability or obligation due to the

7   Reorganized Debtors and Reorganized Herbst Gaming, or their respective property; and (v)

8   commencing or continuing any action, in any manner or any place, that does not comply, or is

9   inconsistent, with the provisions of the Plan or the Bankruptcy Code.  All injunctions or stays

10  provided for in the Chapter 11 Cases under Sections 105 or 362 of the Bankruptcy Code, or

11  otherwise, and in existence on the Confirmation Date, will remain in full force and effect until

12  the Substantial Consummation Date.  By accepting distributions pursuant to the Plan, each

13  Holder of an Allowed Claim will be deemed to have consented to such injunctions.

14      **7.    Debtors' Releases.**

15      On and as of the Substantial Consummation Date, for good and valuable consideration

16  provided by each of the Releasing Parties, including, but not limited to: (i) the discharge of debt

17  and all other good and valuable consideration paid pursuant to the Plan; (ii) the obligations of the

18  Releasing Parties to provide the support necessary for consummation of the Plan; and (iii) the

19  services of the Debtors' present and former officers and directors in facilitating the expeditious

20  implementation of the reorganization contemplated by the Plan, each of the Debtors and

21  Reorganized Debtors will provide a full discharge and release to each Releasing Party and its

22  respective members, officers, directors, agents, financial advisors, attorneys, employees,

23  partners, Affiliates and representatives (but not including any THI Party solely in its capacity as

24  such) (collectively the "Debtor Releasees") (and each such Debtor Releasee so released shall be

25  deemed released and discharged by the Debtors and the Reorganized Debtors) and their

26  respective properties from any and all Cause of Action, whether known or unknown, whether for

27  tort, fraud, contract, violations of federal or state securities laws, or otherwise, arising from or

28  related in any way to the Debtors, the Reorganized Debtors or Reorganized Herbst Gaming,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2                          103

1   including those that any of the Debtors, the Reorganized Debtors or Reorganized Herbst Gaming

2   would have been legally entitled to assert in their own right (individually or collectively) or that

3   any Holder of a Claim or Equity Interest or other entity would have been legally entitled to assert

4   on behalf of any of the Debtors or any of their Estates, and further including those in any way

5   related to the Chapter 11 Cases or the Plan to the fullest extent of the law; *provided, however*,

6   that (a) the foregoing Debtor Releases will not waive or release any Releasing Party from any

7   Cause of Action (i) expressly set forth in and preserved by the Plan, the Plan Supplement or

8   related documents or (ii) arising under the Reorganized Herbst Gaming Senior Credit Facility,

9   and (b) the Debtor Release shall not be granted, and shall not be deemed to have been granted, to

10  any Debtor Releasee that the Bankruptcy Court determines by Final Order to have failed to take

11  any reasonable actions in furtherance of Confirmation and Consummation of the Plan or in any

12  material way took actions inconsistent with, or that materially delayed or hindered, Confirmation

13  or Consummation of the Plan or the transactions contemplated in this Plan.

14          **8.      Third Party Release.**

15          On and as of the Substantial Consummation Date, to the extent permitted by law, the

16  Releasing Parties will provide a full discharge and release to the Third Party Releasees and their

17  respective property from any and all Causes of Action, whether known or unknown, whether for

18  tort, fraud, contract, violations of federal or state securities laws, or otherwise, arising from or

19  related in any way to the Debtors, including, without limitation, those in any way related to the

20  Chapter 11 Cases or the Plan to the fullest extent of the law (the "Third Party Release");

21  provided, however, that the Third Party Release will not waive or release any of the Third Party

22  Releasees from any Causes of Action (i) expressly set forth in and preserved by the Plan, any

23  Plan supplement or related documents or (ii) arising under the Herbst Gaming Senior Credit

24  Facility.

25  **B.      Exculpation.**

26          From and after the Substantial Consummation Date, neither the Debtors, Reorganized

27  Debtors, Statutory Committees, Consenting Lenders, Reorganized Herbst Gaming, nor any of

28  their respective present or former members, directors, officers, managers, employees, advisors,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2                                        104

1    attorneys or agents (excluding any THI Party solely in its capacity as such), will have or incur

2    any liability to any Holder of a Claim or Equity Interest or any other party-in-interest, or any of

3    their respective agents, employees, representatives, financial advisors, attorneys or Affiliates, or

4    any of their successors or assigns, for any act or omission in connection with, relating to, or

5    arising out of (from the Petition Date forward) the Chapter 11 Cases, the Reorganized Debtors,

6    or the pursuit of confirmation of the Plan, except for gross negligence or willful misconduct, and

7    in all respects shall be entitled to rely reasonably upon the advice of counsel with respect to their

8    duties and responsibilities under the Plan or in the context of the Chapter 11 Cases.  No Holder

9    of a Claim or Equity Interest, nor any other party-in-interest, including their respective agents,

10    employees, representatives, financial advisors, attorneys or Affiliates, will have any right of

11    action against the Debtors, Reorganized Debtors, Statutory Committees, Reorganized Herbst

12    Gaming, or any of their respective present or former members, officers, directors, managers,

13    employees, advisors, attorneys or agents (excluding any THI Party solely in its capacity as such),

14    for any act or omission in connection with, relating to, or arising out of (from the Petition Date

15    forward) the Chapter 11 Cases, the pursuit of Confirmation, or the administration of the Plan,

16    except for (i) their willful misconduct or gross negligence, (ii) matters specifically contemplated

17    by either the Plan or the Reorganized Debtors and (iii) any liability of an attorney to its client not

18    subject to exculpation under the Bankruptcy Code.

19    **C.    Director And Officer Liability Insurance.**

20           As of the Substantial Consummation Date, Herbst Gaming will obtain sufficient tail

21    coverage under a directors' and officers' liability insurance policy (together with all insurance

22    policies for directors and officers' liability maintained by the Debtors as of the Petition Date, the

23    "D&O Liability Insurance Policies") for the current and former directors and officers for a period

24    of six years.  As of the Substantial Consummation Date, the Reorganized Debtors will assume all

25    of the D&O Liability Insurance Policies pursuant to Section 365(a) of the Bankruptcy Code, and

26    Herbst Gaming will assume and, if applicable, assign to Reorganized Herbst Gaming all of the

27    D&O Liability Insurance Policies pursuant to Section 365(a) of the Bankruptcy Code.  Entry of

28    the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors'

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

105

1  assumption and Herbst Gaming's assumption and assignment of each of the D&O Liability

2  Insurance Policies.  Notwithstanding anything to the contrary in the Plan, Confirmation will not

3  discharge, impair or otherwise modify any indemnity obligations assumed by the assumption of

4  the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed an

5  Executory Contract that has been assumed by the Debtors under the Plan as to which no proof of

6  Claim need be filed.

7  **D.     Indemnification.**

8          All indemnification provisions currently in place (whether in any bylaws, articles of

9  incorporation, certificates of limited partnership, limited partnership agreements, articles of

10 organization, operating agreements, board resolutions (or resolutions of similar bodies) or

11 employment contracts) for the current and former directors, officers, employees, attorneys, other

12 professionals and agents of any Debtors or their subsidiaries and for the respective Affiliates of

13 any such Persons will be assumed, and will survive effectiveness of the Plan.     All

14 indemnification provisions in place as of the Substantial Consummation Date for current and

15 former directors, officers, employees, attorneys, other professionals and agents of any Debtors or

16 their subsidiaries and for the respective Affiliates (excluding any THI Party solely in its capacity

17 as such) shall (i) survive the Substantial Consummation Date for Claims related to or in

18 connection with any actions, omissions or transactions occurring prior to the Substantial

19 Consummation Date and (ii) remain liabilities of the respective Reorganized Debtor and

20 Reorganized Herbst Gaming on behalf of Herbst Gaming.

21                              **XIII.**
                   **RETENTION OF JURISDICTION**
22

**A.     Jurisdiction.**
23

        The Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases and the
24

Reorganized Debtors after the Effective Date as is legally permissible, including jurisdiction to:
25

        1.     Allow, disallow, determine, liquidate, classify, estimate or establish the priority
26

or secured or unsecured status of any Claim or Equity Interest or Disputed Claim or Disputed
27

Equity Interest, including the resolution of any request for payment of any Administrative Claim
28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2                                    106

and the resolution of any and all objections to the allowance or priority of Claims or Disputed Claims and Equity Interests or Disputed Equity Interests;

2.    Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

3.    Resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtors or Reorganized Debtors are a party and to hear, determine and, if necessary, liquidate any Claims arising therefrom or Cure amounts related thereto;

4.    Ensure that Distributions to Holders of Allowed Claims and Equity Interests are accomplished pursuant to the Plan;

5.    Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications or motions involving any Debtors or Reorganized Debtors that are pending on the Effective Date or commenced thereafter as provided for by the Plan;

6.    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan, this Disclosure Statement or the Confirmation Order, except as otherwise provided in the Plan;

7.    Decide or resolve any cases, controversies, suits or disputes that arise in connection with the consummation, interpretation or enforcement of any Final Order, the Plan, the Confirmation Order or any Person's obligations incurred in connection with any Final Order, the Plan or the Confirmation Order;

8.    Modify the Plan pursuant to Section 1127 of the Bankruptcy Code and Section 12.1 of the Plan or modify any contract, instrument, release or other agreement or document created in connection with the Plan, this Disclosure Statement, the Confirmation Order, or the Reorganized Debtors; or remedy any defect or omission or reconcile any inconsistency in any Final Order, the Plan, the Confirmation Order, or any contract, instrument, release or other

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

107

agreement or document created in connection with the Plan, this Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

9.      Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of any Final Order, the Plan or the Confirmation Order, except as otherwise provided in the Plan;

10.     Enter and implement such orders as are necessary or appropriate if a Final Order or the Confirmation Order is modified, stayed, reversed, revoked or vacated;

11.     Determine any other matters that arise in connection with, or relate to, the Plan, any Final Order, this Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan, this Disclosure Statement, any Final Order or Confirmation Order, except as otherwise provided in the Plan;

12.     Enter an order closing the Chapter 11 Cases;

13.     Hear and decide Litigation Claims and any other claim or cause of action of the Debtors or Reorganized Debtors; and

14.     Decide or resolve any matter over which the Bankruptcy Court has jurisdiction pursuant to Section 505 of the Bankruptcy Code.

## XIV.
## MODIFICATION AND AMENDMENT OF THE PLAN

Prior to Confirmation, the Debtors may alter, amend or modify the Plan under Section 1127(a) of the Bankruptcy Code at any time, subject to approval by a Requisite Majority.  After the Confirmation Date and prior to the Substantial Consummation Date, with the consent of a Requisite Majority, the Debtors may, under Section 1127(b), (c) and (d) of the Bankruptcy Code, alter, amend or modify the Plan or institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, this Disclosure Statement or the Confirmation Order, and to make appropriate adjustments and modifications to the Plan or the Confirmation Order as may be necessary to carry out the Plan, so long as such proceedings do

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

108

not materially and adversely affect the treatment of Holders of Claims under the Plan.

## XV.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

### A.    Introduction.

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and certain Holders of Claims. The following summary does not address the U.S. federal income tax consequences to Holders whose Claims are unimpaired or otherwise entitled to payment in full in Cash under the Plan (e.g., Allowed Administrative Claims and Allowed Priority Tax Claims). The following summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Department of the Treasury ("Treasury") regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have a retroactive effect and could significantly affect the tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. No assurance can be given that legislative or administrative changes or court decisions will not be forthcoming which would require significant modification of the statements in this section. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any tax aspects of the Plan. Therefore, no assurance can be given as to the position the IRS will take on the tax consequences of the transactions that are to occur in accordance with the Plan.

This summary does not address foreign, state or local tax consequences of the Plan, nor does it address the U.S. federal income tax consequences of the Plan to the particular circumstances of any Holder or to Holders subject to special income tax rules (such as, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers, tax-exempt organizations (including pension funds), persons holding a Claim as part of an integrated constructive sale or straddle or part of a conversion transaction, and investors in pass-through entities). In addition, the summary does not include a full

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

109

1   summary of the consequences to Holders of Claims who are not "U.S. Persons" (as defined in

2   the IRC) and tax-exempt Holders.    However, there may be some potentially significant

3   consequences to non-U.S. Persons which are not discussed below, and such non-U.S. Persons are

4   encouraged to carefully consider their particular tax consequences with their own tax advisers.

5   Moreover, the summary only contains a certain limited discussion of tax consequences to tax-

6   exempt Holders.

7        This discussion assumes that the various debt and other arrangements to which Herbst

8   Gaming is a party will be respected for federal income tax purposes in accordance with their

9   form.

10       The following discussion is a general summary of certain U.S. federal income tax aspects

11  of the Plan and should not be relied upon for purposes of determining the specific tax

12  consequences of the Plan with respect to a particular Holder of a Claim.  EACH HOLDER OF A

13  CLAIM AFFECTED BY THE PLAN SHOULD CONSULT ITS OWN TAX ADVISOR

14  REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO

15  THAT HOLDER'S CLAIM, INCLUDING UNDER ANY APPLICABLE STATE, LOCAL OR

16  FOREIGN LAW.

17       TO    ENSURE    COMPLIANCE    WITH    IRS    CIRCULAR    230    AND    THE

18  REQUIREMENTS IMPOSED BY THE IRS, HOLDERS OF CLAIMS ARE HEREBY

19  NOTIFIED THAT: (i) ANY DISCUSSION OF TAX ISSUES CONTAINED OR REFERRED

20  TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE

21  USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING TAX RELATED

22  PENALTIES THAT MAY BE IMPOSED UNDER THE IRC; AND (ii) THIS DISCUSSION

23  WAS WRITTEN IN CONNECTION WITH THE PROMOTION OF THE PLAN.

24  **B.    Tax Consequences To The Debtors And Newly Formed Entities.**

25       Set forth below in this Section is a discussion of certain tax consequences to the Debtors

26  and newly formed entities in connection with the effectuation of the Plan.

27       **1.    Overview of Transaction Steps.**

28       Herbst Gaming is an S corporation for federal income tax purposes and is generally not

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

110

1   subject to built-in gains tax under IRC section 1374.   However, certain assets of The Sands and

2   its subsidiaries may be subject to built-in gains tax.   Additionally, Herbst Gaming's subsidiaries

3   are qualified subchapter S subsidiaries and limited liability companies, which are disregarded

4   entities for U.S. federal income tax purposes.

5   The Plan involves: (i) Herbst Gaming's qualified subchapter S subsidiaries being

6   converted into limited liability companies; (ii) Herbst Gaming contributing all of its assets,

7   including the equity interests in its limited liability company subsidiaries and its other assets to a

8   holding limited liability company, Reorganized Herbst Gaming, in exchange for limited liability

9   interests in Reorganized Herbst Gaming and newly issued Reorganized Herbst Gaming Senior

10   Notes; and (iii) Herbst Gaming transferring the Reorganized Herbst Gaming New Common

11   Equity and Reorganized Herbst Gaming Senior Notes to the Holders of Allowed Class 3 Claims.

12   In connection with the conversion and contribution discussed in <u>clauses (i) and (ii)</u> above,

13   due to the fact that both Herbst Gaming's qualified subchapter S subsidiaries and the limited

14   liability companies into which they are converted are disregarded entities for tax purposes, the

15   conversion of such qualified subchapter S subsidiaries into limited liability companies has no

16   federal tax effect.   Similarly, as Reorganized Herbst Gaming in the hands of Herbst Gaming is a

17   disregarded entity, the contribution by Herbst Gaming of its assets, including the limited liability

18   company interests in its subsidiaries to Reorganized Herbst Gaming, in exchange for

19   Reorganized Herbst Gaming New Common Equity and Reorganized Herbst Gaming Senior

20   Notes will have no tax effect.

21   In connection with the transfer of the Reorganized Herbst Gaming New Common Equity

22   and Reorganized Herbst Gaming Senior Notes to the Holders of Allowed Class 3 Claims, such

23   transfer will be treated as an exchange by Herbst Gaming of its assets to the Holders of Allowed

24   Class 3 Claims in exchange for the Allowed Class 3 Claims.   The Allowed Class 3 Claims

25   constitute recourse debt of Herbst Gaming.   Accordingly, Herbst Gaming will recognize gain or

26   loss on such exchange in the amount equal to the difference between Herbst Gaming's basis in

27   its assets and the fair market value of such assets and cancellation of indebtedness ("COD")

28   income equal to the excess of the adjusted issue price of the Allowed Class 3 Claims over the fair

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

111

1   market value of the Herbst Gaming assets. The treatment of such gain and COD income is

2   discussed below.

3       During the time in which Reorganized Herbst Gaming is a wholly owned entity of Herbst

4   Gaming, Reorganized Herbst Gaming will be a disregarded entity for federal income tax

5   purposes. However, when the Holders of Allowed Class 3 Claims own Reorganized Herbst

6   Gaming New Common Equity, Reorganized Herbst Gaming will be treated as a partnership for

7   federal income tax purposes. The Holders of Allowed Class 3 Claims will be treated as having

8   exchanged their interests in the Senior Credit Facility for undivided interests in the assets of

9   Reorganized Herbst Gaming, the disregarded entity, and as having contributed those assets to

10  Reorganized Herbst Gaming, the partnership, in exchange for Reorganized Herbst Gaming New

11  Common Equity and Reorganized Herbst Gaming Senior Notes. The tax consequences in

12  connection with the exchange and contribution of the Holders of Class 3 Claims and the receipt

13  of Reorganized Herbst Gaming New Common Equity and of the Reorganized Herbst Senior

14  Loan are described below under Section XV.C.

15       2.    **Herbst Gaming Gain and Loss and Cancellation of Indebtedness Income.**

16           a.    **Gain and Loss**. As noted above, Herbst Gaming will recognize gain or

17  loss on its transfer of the Reorganized Herbst Gaming New Common Equity and Reorganized

18  Herbst Gaming Senior Notes to the Holders of Allowed Class 3 Claims in an amount equal to the

19  difference between the fair market value of Herbst Gaming's assets and Herbst Gaming's basis

20  in its assets. Except to the extent that Herbst Gaming owns assets that are subject to the built-in

21  gains tax under IRC section 1374, Herbst Gaming will not be responsible for the payment of the

22  tax on any gain, and such gain or loss of Herbst Gaming will be allocated to its shareholders.

23  IRC section 1374 applies to certain assets (i) that were formerly held by a C corporation and that

24  were owned by a C corporation when such corporation elected to be treated as an S corporation

25  or (ii) that an S corporation acquired from a C corporation in certain tax free transactions. As to

26  such assets, an S corporation, as an entity, is liable for the tax on the gain recognized during a

27  certain period which is generally ten years (seven years for gain recognized in 2009 or 2010).

28  The entity level tax is imposed on the gain recognized up to the amount of the gain in the assets

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2                                    112

1    at the time the C corporation became an S corporation or acquired such assets. In connection

2    with the effectuation of the Plan, Herbst Gaming, as an entity, may be liable for tax on any gain

3    attributable to such assets.

4            **b.**    **COD Income—General Rule**. Herbst Gaming will recognize COD

5    income. In general, a debtor realizes COD income upon satisfaction of its outstanding

6    indebtedness for total consideration less than the amount of such indebtedness. For this purpose,

7    the amount of the indebtedness cancelled is the adjusted issue price of such indebtedness (plus

8    any accrued but unpaid interest). The consideration received for the debt is the sum of (i) any

9    cash received and the fair market value of any property (other than debt) received and (iii) the

10    issue price of any debt instruments received. Applying these rules to the current transactions, the

11    amount of COD income realized by Herbst Gaming will equal the excess of the adjusted issue

12    price of the Claims immediately prior to the time such Claims are cancelled (including any

13    Herbst Gaming debt that is cancelled without payment and any accrued but unpaid interest) over

14    any cash and the fair market value of the assets transferred by Herbst Gaming. There will be no

15    COD income as to Claims paid in full. As to the exchange by the Holders of Allowed Class 3

16    Claims for the interests in Reorganized Herbst Gaming, the amount of COD income will equal

17    the adjusted issue price of those debt claims (i.e., the Senior Credit Facility Claims) over the fair

18    market value of the assets owned by Reorganized Herbst Gaming and the issue price of the

19    Reorganized Herbst Gaming Senior Loan. The concept of adjusted issue price is discussed

20    below in Section XV.B.2.c.

21            **c.**    **COD Income—Issue Price and Adjusted Issue Price**. The computation

22    of the amount of COD Income to be recognized by Herbst Gaming with respect to the Allowed

23    Class 3 Claims depends on the adjusted issue price of the debt represented by such claims

24    immediately prior to their cancellation. These concepts are related to the original issue discount

25    ("OID") rules of the IRC, and these rules are discussed in some detail due to the fact that such

26    rules are relevant in determining the tax consequences to the Holders of Allowed Class 3 Claims

27    in connection with their holding of Reorganized Herbst Gaming Senior Loan.

28            Under the OID rules, the "issue price" of debt depends on how the debt is issued. The

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

113

1   issue price of debt issued for cash is the price at which a substantial amount of the debt is sold.

2   The issue price of a publicly traded debt instrument issued for property is the fair market value of

3   the debt instrument determined as of the issue date.  If a debt instrument that is not publicly

4   traded is issued for publicly traded property, the issue price of the debt instrument is equal to its

5   fair market value determined with respect to the trading prices of the publicly traded property.

6   The issue price of a debt instrument that is not publicly traded and that is issued in exchange for

7   property that is not publicly traded is the stated principal amount of such debt instrument as long

8   as the instrument provides for adequate interest (i.e., interest at least equal to certain rates

9   published monthly by the IRS).

10      A debt instrument is considered publicly traded if it is traded on an "established securities

11  market" at any time during the 60-day period ending 30 days after the Substantial Consummation

12  Date. In general, a debt instrument (or the property exchanged therefor) will be treated as traded

13  on an established securities market if (i) it is listed on (a) a qualifying national securities

14  exchange, (b) certain qualifying interdealer quotation systems, or (c) certain qualifying foreign

15  securities exchanges; (ii) it appears on a system of general circulation (including a computer

16  listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to

17  determine fair market value by disseminating either recent price quotations or actual prices of

18  recent sales transactions; or (iii) the price quotations are readily available from dealers, brokers

19  or traders.  In general, an issuer's determination of issue price is binding on all holders of the

20  relevant debt, other than a holder that explicitly discloses its inconsistent treatment in a statement

21  attached to its timely filed tax return for the taxable year in which it is issued the debt.

22      The adjusted issue price of debt is the issue price of the debt as adjusted for OID.

23  Generally, a debt instrument is treated as having OID if its "stated redemption price at maturity"

24  exceeds its "issue price" by more than a de minimis amount.  A debt instrument's stated

25  redemption price at maturity includes all principal and interest payable over the term of the debt,

26  other than qualified stated interest.  Stated interest is "qualified stated interest" if it is payable in

27  cash at least annually.  Holders of a debt instrument that is issued with OID are generally

28  required to include any OID in income over the term of the instrument in accordance with a

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

114

1    constant yield-to-maturity method, regardless of whether the Holder is a cash or accrual method

2    taxpayer, and regardless of whether and when the Holder receives cash payments of interest on

3    the note (other than cash attributable to qualified stated interest).  The adjusted issue price of

4    debt is the debt's issue price as increased by any OID that has accrued with  respect to such debt

5    and decreased by any payments on the debt other than payments of qualified stated interest.

6    Some of the outstanding Senior Credit Facility was issued without OID.  Thus, with respect to

7    the portion of the outstanding Senior Credit Facility which was issued without OID, the adjusted

8    issue price of that debt is its stated principal amount.  For the portion which issued with OID, the

9    adjusted price of that debt is computed taking into account the accrued OID.

10         **d.     Exceptions to COD Income Inclusion**.  Herbst Gaming will be able to take

11    advantage of two exceptions of being required to realize COD income.  First, COD income is not

12    realized to the extent that the payment of the tax liability would have given rise to a deduction.

13    Thus, Herbst Gaming will not be required to recognize COD income with respect to accrued but

14    unpaid interest to the extent that it has not deducted such interest.

15         Second, a debtor is not required to include any COD income in gross income if the debtor

16    is under the jurisdiction of a court in a bankruptcy case and the discharge of debt occurs pursuant

17    to that proceeding.  As a consequence of such exclusion, a debtor in bankruptcy that recognizes

18    COD income is required to reduce its tax attributes by the amount of COD income that it

19    excluded from gross income.  Such COD income will reduce certain tax attributes of the debtor

20    generally in the following order: (i) net operating losses ("NOLs"); (ii) general business credits;

21    (iii) tax credits; (iv) capital loss carryovers; (v) tax basis of property; (vi) passive loss and credit

22    carryovers; and (vii) foreign tax credits.  The reduction to basis is made after the determination

23    of tax for the taxable year in which the discharge of indebtedness occurs.  In the case of a

24    discharge of indebtedness by Herbst Gaming, which is an S corporation, and the other Debtors,

25    which are disregarded entities owned by the S corporation, the bankruptcy exception to taking

26    COD income into income, as well as the reductions of attributes, are generally applied at the

27    corporate level rather than the shareholder level.  An S corporation and the other disregarded

28    entities are generally not taxable entities, and thus are not entitled to NOLs.  However, in the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2                                    115

1    case of COD income of an S corporation, the COD income can reduce certain losses allocated to

2    the S corporation's shareholders that the shareholders were not entitled to claim because of the

3    rule that limits an S corporation's shareholder's ability to claim such losses in excess of the

4    shareholder's basis in the stock or debt of the S corporation.  Under the current facts, any Herbst

5    Gaming COD income is likely to reduce the suspended loss of the shareholders of Herbst

6    Gaming.  After the Holders of Allowed Class 3 Claims receive their interests in Reorganized

7    Herbst Gaming, Herbst Gaming is not likely to have material other attributes to reduce.

8    **C.      Tax Consequences To Certain Holders Of Claims.**

9              **1.      Consequences to Holders of Allowed Other Priority Claims, General
                        Unsecured Claims and Allowed Other Secured Claims.**

10             Pursuant to the Plan, each Allowed Other Priority Claim and Allowed General Unsecured

11   Claim will be paid in full in Cash, and each Allowed Other Secured Claim will either be

12   reinstated or paid in full in Cash. If a Holder receives Cash in satisfaction of its Claim, such

13   Holder will generally recognize income, gain or loss for U.S. federal income tax purposes in

14   amount equal to the difference between (i) the amount of Cash and (ii) the Holder's adjusted tax

15   basis in the Claim.  The character of such gain or loss as capital gain or loss or as ordinary

16   income or loss will be determined by a number of factors, including: (a)  the tax status of the

17   Holder; (b) the nature of the Claim in such Holder's hands; (c) whether the Claim constitutes a

18   capital asset in the hands of the Holder; (d) whether the Claim was purchased at a discount; and

19   (e) whether and to what extent the Holder has previously claimed a bad debt deduction with

20   respect to its Claim.  If an Allowed Other Secured Claim is Reinstated, the Holder of such Claim

21   should not recognize gain or loss except to the extent that the collateral securing such Claim is

22   changed, and that the change in collateral constitutes a "significant modification" of the Allowed

23   Other Secured Claim within the meaning of Treasury regulations promulgated under IRC section

24   1001.

25             **2.      Consequences to Holders of Allowed Class 3 Claims (Senior Credit Facility
                        Claims).**

26             Holders of Allowed Class 3 Claims will be deemed to exchange their debt for the assets

27   of Reorganized Herbst Gaming, characterized as a disregarded entity for federal tax purposes,

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

1    and to contribute those assets to Reorganized Herbst Gaming, characterized as a newly formed

2    partnership for federal tax purposes.  The exchange of such debt for assets will be a taxable

3    exchange.  A Holder of an Allowed Class 3 Claim will recognize gain or loss equal to the

4    difference between its tax basis in the Allowed Class 3 Claim (other than any tax basis

5    attributable to accrued but unpaid interest) and the fair market value of the assets that it is

6    deemed to receive (other than any such amounts treated as received with respect to a claim for

7    accrued but unpaid interest).  In general, such gain or loss should be capital in nature (subject to

8    the market discount rules discussed below in Section XV.C.4.) and should be long-term capital

9    gain or loss if the debts constituting the surrendered Allowed Class 3 Claim were held for more

10   than one year.  To the extent that all or a portion of the share of the consideration received by

11   such Holder is allocable to accrued but untaxed interest, such Holder may recognize ordinary

12   interest income (see discussion in Section XV.C.3. below, regarding accrued interest).  A

13   Holder's tax basis in the assets that it is deemed to receive should be equal to such Holder's fair

14   market value, and the holding period in such assets should begin on the day following the

15   Substantial Consummation Date.

16        A Holder of an Allowed Class 3 Claim will be deemed to contribute its assets that it is

17   deemed to receive for Reorganized Herbst Gaming New Common Equity and Reorganized

18   Herbst Gaming Senior Loan.  The contribution of assets in exchange for equity in Reorganized

19   Herbst Gaming (i.e., Reorganized Herbst Gaming New Common Equity) should be treated as a

20   tax free contribution to the Holders and to Reorganized Herbst Gaming.  The Holder's basis in

21   the Reorganized Herbst Gaming New Common Equity will be equal to the basis of the assets

22   deemed contributed for such equity interest which will equal the fair market value of such assets,

23   less any amount treated as contributed in exchange for its pro rata interest in Reorganized Herbst

24   Gaming Senior Loan (as described in Section XV.C.3 below), plus the Holder's share of any

25   Reorganized Herbst Gaming Senior Notes, determined under detailed rules.  A Holder's holding

26   period for its Reorganized Herbst Gaming New Common Equity Interests will begin on the day

27   following the Substantial Consummation Date.

28        The tax treatment of the exchange of assets for Reorganized Herbst Gaming Senior Loan

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2                                                              117

1   is unclear. Because a Holder of Reorganized Herbst Gaming Senior Loan will hold assets that it

2   is deemed to exchange for debt with a fair market value basis, the Holder should not recognize

3   gain on the exchange. A Holder should be deemed to hold its interest in the Reorganized Herbst

4   Gaming Senior Loan with a basis equal to the issue price of such debt, with such issue price

5   determined in accordance with the discussion set forth in Section XV.B.2.3 above. A Holder's

6   holding period in such debt will begin on the day following the Substantial Consummation Date.

7       **3.**    **Accrued Interest.**

8         To the extent that any amount received by a Holder of a surrendered Claim under the

9   Plan is attributable to accrued but unpaid interest and such amount has not previously been

10  included in the Holder's gross income, such amount would be taxable to the Holder as ordinary

11  interest income. Conversely, a Holder of a surrendered Claim may be able to recognize a

12  deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that

13  any accrued interest on the debt instruments constituting such Claim was previously included in

14  the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary,

15  but the tax law is unclear on this point. The extent to which the consideration received by a

16  Holder of a surrendered Claim will be attributable to accrued interest on the debts constituting

17  the surrendered Claim is unclear. Certain Treasury regulations generally treat a payment under a

18  debt instrument first as a payment of accrued and untaxed interest and then as a payment of

19  principal. Application of this rule to a final payment on a debt instrument being discharged at a

20  discount in bankruptcy is unclear. The Debtor intends to take the position that payments are

21  applied first to principal.

22      **4.**    **Market Discount.**

23        Under the "market discount" provisions of IRC sections 1276 through 1278, some or all

24  of any gain realized by a Holder exchanging the debt instruments constituting its Claim may be

25  treated as ordinary income (instead of capital gain), to the extent of the amount of "market

26  discount" on the debt constituting the surrendered Claim.

27        In general, a debt instrument is considered to have been acquired with "market discount"

28  if the Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

118

1  payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the

2  case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a

3  de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt

4  instrument, excluding qualified stated interest, multiplied by the number of remaining whole

5  years to maturity).

6  Any gain recognized by a Holder on the taxable disposition (as discussed above) of a

7  debt that it acquired with market discount should be treated as ordinary income to the extent of

8  the market discount that accrued thereon while such debt was considered to be held by the

9  Holder (unless the Holder elected to include market discount in income as it accrued).

10  **5.    Consequences of Holding Reorganized Herbst Gaming New Common Equity.**

11

12  Reorganized Herbst Gaming is expected to be treated as a partnership for federal income

13  tax purposes.  As such, it will not itself be subject to tax.  Instead, Reorganized Herbst Gaming

14  will file an annual information return with the IRS, reporting its taxable income and loss and

15  each partner's allocable share of the taxable income, gain, loss, deduction and credit resulting

16  from its operations.  Each Holder of Reorganized Herbst Gaming New Common Equity must

17  include in income its distributive share of Reorganized Herbst Gaming's net long-term capital

18  gain and loss, net short-term capital gain or loss and all other items of ordinary income, loss,

19  deduction or credit whether or not it has received a distribution from Reorganized Herbst

20  Gaming.  Thus, a Holder of Reorganized Herbst Gaming New Common Equity may incur tax

21  liability without being distributed Cash to pay such tax liability.

22  Non-U.S. Persons and tax exempt persons who own Reorganized Herbst Gaming New

23  Common Equity directly would be treated as engaged in a U.S. trade or business and as receiving

24  allocations of Reorganized Herbst Gaming income, which will consist primarily of ordinary

25  operating income.  Non-U.S. Persons would be required to file U.S. tax returns and to pay U.S.

26  income taxes on their allocated share of the Reorganized Herbst Gaming income.  Reorganized

27  Herbst Gaming will be required to withhold tax on a non-U.S. Person's share of Reorganized

28  Herbst Gaming's taxable income whether or not the non-U.S. Person files a return.  Non-U.S.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

119

1   Persons will be allowed a tax credit for their share of the  withholding tax paid by Reorganized

2   Herbst Gaming.  Tax-exempt persons would be treated as realizing unrelated business taxable

3   income and would be required to pay tax on that income.

4            Generally, a Holder of Reorganized Herbst Gaming New Common Equity would

5   recognize gain or loss upon disposing of such equity equal to the excess (or deficiency) of the

6   Holder's amount realized with respect to the sold equity over the Holder's basis in the sold

7   equity.  The amount realized will equal the cash received by the Holder plus the Holder's share

8   of Reorganized Herbst Gaming Senior Loan, which is determined under detailed rules not

9   discussed in this summary.  The Holder's basis would equal its initial basis in the Reorganized

10  Herbst Gaming New Common Equity increased by the Holder's additional contributions to

11  Reorganized Herbst Gaming and the Holder's allocated share of Reorganized Herbst Gaming

12  income and reduced by the Holder's allocated share of Reorganized Herbst Gaming losses and

13  the amount of cash and the basis of assets distributed to such Holder (with marketable securities

14  being treated as cash in certain circumstances) plus the Holder's share of Reorganized Herbst

15  Gaming Senior Loan.  Any gain or loss on a sale of the equity generally will be capital gain or

16  loss and gain will be long-term gain, subject to preferential capital gains rates for an individual

17  Holder if the interest in Reorganized Herbst Gaming has been held for over a year.  However,

18  any gain will be ordinary income to the extent that it is attributable to IRC section 751 assets;

19  generally assets sold by Reorganized Herbst Gaming would give rise to ordinary income.  The

20  IRS's position is that a non-U.S. Person would be subject to U.S. tax on its sale of Reorganized

21  Herbst Gaming New Common Equity, as such equity is an interest in a partnership doing

22  business in the U.S.  To the extent that Reorganized Herbst Gaming was subject to debt at the

23  time of any sale, a portion of any gain recognized by a tax-exempt person on a sale of the

24  Reorganized Herbst Gaming New Common Equity may be taxable as unrelated debt-financed

25  income.  Nevertheless, there is an argument that it is not taxable to the extent that the tax-exempt

26  person owns a pro rata portion of the Reorganized Herbst Gaming New Common Equity and

27  Reorganized Herbst Gaming Senior Loan.

28           Generally, a Holder of Reorganized Herbst Gaming New Common Equity will not

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

1    recognize income or gain upon a distribution of cash to it unless and to the extent that the amount

2    of cash distributed to the Holder exceeds its basis in the equity immediately before the

3    distribution. Any such gain will generally be treated as gain from the sale of a capital asset and

4    will be long-term gain subject to preferential capital gain rates for individual Holders if the notes

5    have been held for more than one year, though the gain will be ordinary income to the extent that

6    such gain is attributable to IRC section 751 assets. Non-U.S. Persons and tax-exempt persons

7    may be taxable on such gain to the extent described above. A Holder of Reorganized Herbst

8    Gaming New Common Equity will not recognize loss on a distribution of cash except for

9    distributions in complete liquidation of its equity. Subject to important exceptions, a distribution

10   of marketable securities by Reorganized Herbst Gaming may be treated as a distribution of cash

11   rather than as a distribution of property. If Reorganized Herbst Gaming were to distribute

12   property (other than cash or, possibly, marketable securities) to a Holder with respect to its

13   equity other than in complete liquidation of such Holder's Reorganized Herbst Gaming New

14   Common Equity, no gain or loss would generally be recognized and the Holder's basis in the

15   property distributed would equal Reorganized Herbst Gaming's basis in the property, limited by

16   the amount of the holder's basis in its Reorganized Herbst Gaming New Common Equity. If

17   Reorganized Herbst Gaming were to distribute property (other than cash or marketable

18   securities) to a Holder with respect to its equity in a complete liquidation of such Holder's

19   equity, no gain or loss would generally be recognized and the Holder's basis in the property

20   distributed would equal such Holder's basis in its Reorganized Herbst Gaming New Common

21   Equity. These rules may not apply if a distribution alters a Holder's interest in IRC section 751

22   assets. Such distributions may trigger gain to the Holder of Reorganized Herbst Gaming New

23   Common Equity, and some of that gain may be ordinary income.

24        A number of limitations may apply to losses allocated by Reorganized Herbst Gaming to

25   a Holder of Reorganized Herbst Gaming New Common Equity. As such loss limitations may

26   depend on a Holder's own status and circumstances, such loss limitations are not discussed in

27   detail in this summary. Such loss limitations include: (i) no Holder may deduct losses in excess

28   of such Holder's basis in its equity; (ii) a Holder that is an individual or is a certain closely held

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

121

1   corporation cannot deduct losses that exceed the amount such Holder has at risk in Reorganized

2   Herbst Gaming, with the amount at risk generally not including a Holder's share of nonrecourse

3   debt; and (iii) as to an individual and certain closely held corporations that do not actively

4   participate in the Reorganized Herbst Gaming business, such losses will be subject to the passive

5   loss limitations, and cannot be used to offset income from an active business in which the

6   individual (or closely held corporation) does actively participate (including salary) or certain

7   investment income such as interest, dividends and capital gains related to investment assets.

8           Generally, a partnership that is publicly traded is taxable as a corporation.  Reorganized

9   Herbst Gaming intends to limit trading in its interests to avoid becoming a publicly traded

10  partnership taxable as a corporation.  If Reorganized Herbst Gaming becomes a corporation or a

11  publicly traded partnership taxed as a corporation, it is likely that the transaction will be viewed

12  as Reorganized Herbst Gaming contributing its assets to a newly formed corporation in exchange

13  for that corporation's stock and distributing that stock to the Holders of its equity (though other

14  characterizations as possible depending on the manner in which Reorganized Herbst Gaming

15  became a corporation).  Such contribution would generally be tax free except (i) to the extent

16  that the liabilities encumbering the Reorganized Herbst Gaming assets exceeded the basis of

17  those assets for federal income tax purposes and (ii) the extent that, after taking into account any

18  gain resulting from the liabilities encumbering the Reorganized Herbst Gaming assets exceeding

19  the basis of those assets, a Holder's share of Reorganized Herbst Gaming liabilities exceeded the

20  Holder's basis in its Reorganized Herbst Gaming New Common Equity.  A Holder's basis in the

21  newly formed corporation's stock would equal the Holder's basis in its  Reorganized Herbst

22  Gaming New Common Equity, increased by an gain recognized by such Holder.  To the extent

23  Reorganized Herbst Gaming's assets were capital assets or IRC section 1231 assets, Reorganized

24  Herbst Gaming's holding period in the stock it receives reflects its holding period for the

25  contributed Reorganized Herbst Gaming assets; otherwise Reorganized Herbst Gaming's holding

26  period in the stock will begin on the day after the incorporation transaction.  A Holder receiving

27  a distribution of new corporation stock from Reorganized Herbst Gaming will hold that stock

28  with the same holding period Reorganized Herbst Gaming held such stock.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

122

1    If Reorganized Herbst Gaming is taxable as a corporation, it will be taxable on its
2 income, and neither its income nor its deductions will pass through to Holders of its equity
3 interests. Distributions on such equity interests will be treated as dividends to the extent of
4 Reorganized Herbst Gaming's current or accumulated earnings and profits, as a return of capital
5 to the extent of the Holder's basis in that equity and then as capital gains.  U.S. corporate
6 recipients of dividends may be entitled to a 70% or 80% dividends received deduction.  U.S.
7 individual recipients may be entitled to the preferential dividend tax rates applicable to "qualified
8 dividends." Dividends payable to non-U.S. Persons by a U.S. corporation are subject to a 30%
9 U.S. withholding tax, which rate may be reduced by applicable treaties.

10    In such case, any gain or loss recognized by a Holder on the sale, exchange or other
11 disposition of Reorganized Herbst Gaming New Common Equity generally should be capital
12 gain or loss in an amount equal to the difference, if any, between the amount realized by the
13 Holder and the Holder's adjusted tax basis in such equity immediately before the sale, exchange,
14 or other disposition.  Any such gain or loss generally should be long-term if the Holder's holding
15 period for its equity interest is more than one year at that time.  The use of capital losses is
16 subject to limitations.

17    A tax-exempt person will generally not be taxable on the sale of corporate equity unless
18 that equity is subject to debt financing.  Similarly, a non-U.S. Person is not generally taxable on
19 their sale of equity in U.S. corporations.  However, under the Foreign Investment in Real
20 Property Tax Act (usually referred to as FIRPTA), a non-U.S. Person is taxable on the sale of
21 stock in a United States Real Property Holding Corporation ("USRPHC") at the rates of tax
22 applicable to U.S. persons (currently up to 35% for both corporations and individuals).  A
23 corporation will be treated as a USRPHC if 50% or more of its value (as computed in a specified
24 manner) consists of interests in U.S. real property.  The Debtor cannot determine whether any
25 incorporated Reorganized Herbst Gaming is likely to be a USRPHC.

26    **6.    Consequences of Holding Reorganized Herbst Gaming Senior Loan.**

27    Holders of notes issued in connection with the Reorganized Herbst Gaming Senior Loan
28 ("Reorganized Herbst Gaming Senior Notes") will be required to include qualified stated interest

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2                                123

1    (stated interest that is required to be paid in cash at least annually) in income in accordance with

2    the Holders' regular method of accounting.

3         As discussed in <u>Section XV.B.2</u>.c. above, a debt instrument will be treated as issued with

4    OID if its "stated redemption price at maturity" exceeds its "issue price" by more than a de

5    minimis amount. The Holders of Reorganized Herbst Gaming Senior Notes will be treated as

6    issued with OID if such debt is treated as being publicly traded and the public trading price is

7    less than the stated redemption price of the Reorganized Herbst Gaming Senior Notes by more

8    than a de minimis amount. Holders of debt instruments with OID are generally required to

9    include any OID in income over the term of the debt in accordance with a constant yield-to-

10    maturity method, regardless of whether the Holder is a cash or accrual method taxpayer, and

11    regardless of whether and when the Holder receives cash payments of interest on the debt (other

12    than cash attributable to qualified stated interest). Accordingly, a Holder of such debt instrument

13    could be treated as receiving interest income in advance of a corresponding receipt of cash. Any

14    OID that a Holder includes in income will increase the Holder's tax basis in its debt. A Holder

15    of debt with OID will not be separately taxed on the receipt of any cash payments with respect to

16    previously taxed OID, but will reduce its tax basis in such debt by the amount of such payments.

17         In compliance with applicable Treasury regulations, if the Reorganized Herbst Gaming

18    Senior Notes are treated as issued with OID, Reorganized Herbst Gaming will furnish annually

19    to the IRS and the indenture trustee information describing the amount of any accrued OID.

20         Unless a non-recognition provision applies, a Holder generally will recognize gain or loss

21    upon the sale, exchange or redemption of its Reorganized Herbst Gaming Senior Notes equal to

22    the difference, if any, between the Holder's adjusted tax basis in Reorganized Herbst Gaming

23    Senior Notes and the amount realized on the sale, exchange or redemption. For this purpose, a

24    Holder's adjusted tax basis generally will equal the Holder's initial tax basis, increased by the

25    amount of any OID accrued up through the date of the sale, exchange, or redemption, and

26    decreased by the amount of any cash payments (other than qualified stated interest). Subject to

27    the market discount rules discussed in <u>Section XV.C.4</u> above, any gain or loss generally will be

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

124

1  capital gain or loss, and generally should be long-term if the Holder's holding period in its debt

2  is more than one year at that time.

3      **7.    Consequences to Holders of Senior Subordinated Note Claims, Section 726(a)(4) Claims and Equity Interests in Herbst Gaming.**

4

5      Pursuant to the Plan, Holders of Senior Subordinated Note Claims, Section 726(a)(4)

6  Claims, and Equity Interests in Herbst Gaming will have such Claims and Equity Interests

7  terminated and cancelled without any distribution.  A Holder of such Claims or Equity Interests

8  will generally be entitled to a loss equal to the Holder's adjusted basis in such Claims or

9  Interests.  Such loss will generally be capital in nature.  The deductibility of capital losses is

10  subject to limitations.

      **8.    Information Reporting and Backup Withholding.**

11

12      Certain payments, including payments in respect of accrued interest or OID, are generally

13  subject to information reporting by the payer to the IRS.  Moreover, such reportable payments

14  are subject to backup withholding under certain circumstances.  Under the IRC's backup

15  withholding rules, a Holder may be subject to backup withholding at the applicable rate with

16  respect to certain distributions or payments pursuant to the Plan, unless the Holder (i) falls within

17  certain exempt categories (which generally include corporations) and, when required,

18  demonstrates this fact or (ii) provides a correct U.S. taxpayer identification number and certifies

19  under penalty of perjury that the Holder is a U.S. person, the taxpayer identification number is

20  correct and that the Holder is not subject to backup withholding because of a failure to report all

21  dividend and interest income.

22      Backup withholding is not an additional tax. Amounts withheld under the backup

23  withholding rules may be credited against a Holder's U.S. federal income tax liability, and a

24  Holder may obtain a refund of any excess amounts withheld under the backup withholding rules

25  by filing an appropriate claim for refund with the IRS.

26      ALL HOLDERS OF CLAIMS SHOULD CONSULT THEIR TAX ADVISORS TO

27  DETERMINE THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE

28  TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING, WITHOUT

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2            125

1  LIMITATION, THE AMOUNT AND TIMING OF ANY INCOME OR LOSS SUFFERED AS

2  A RESULT OF ANY CANCELLATION OF THE CLAIMS HELD BY SUCH PERSON,

3  WHETHER SUCH INCOME OR LOSS IS ORDINARY OR CAPITAL, AND THE TAX

4  EFFECT OF ANY RIGHT TO, AND RECEIPT OF, ANY EQUITY INTERESTS IN

5  EXCHANGE FOR SUCH CLAIMS.

6      THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS

7  NOT TAX ADVICE. THE TAX CONSEQUENCES ARE, IN MANY CASES, UNCERTAIN

8  AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES.

9  ACCORDINGLY, ALL HOLDERS SHOULD CONSULT THEIR TAX ADVISORS ABOUT

10  THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME TAX AND OTHER TAX

11  CONSEQUENCES OF THE PLAN.

12  **XVI.**
**CONFIRMATION OF THE PLAN**

13  **A.    Confirmation Of The Plan.**

14      Pursuant to Section 1128(a) of the Bankruptcy Code, the Bankruptcy Court will hold a

15  hearing regarding confirmation of the Plan at the United States Bankruptcy Court for the District

16  of Nevada, Reno, 300 Booth Street, Reno, NV 89509, commencing on October 28, 2009, at

17  10:00 a.m. (PDT).

18  **B.    Objections To Confirmation Of The Plan.**

19      Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to

20  confirmation of a plan of reorganization.  Any objections to confirmation of the Plan must be in

21  writing, must state with specificity the grounds for such objections and must be filed with the

22  Bankruptcy Court and served upon the following parties so as to be received on or before the

23  time fixed by the Bankruptcy Court:

24      Counsel for Debtors:

25          Gordon Silver
            3960 Howard Hughes Parkway, 9th Floor
26          Las Vegas, Nevada 89169
            Telephone: 702-796-5555
27          Facsimile: 702-369-2666
            Email: ggordon@gordonsilver.com
28          Attn: Gerald M. Gordon, Esq.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

126

Counsel for the Administrative Agent:

> Milbank, Tweed, Hadley & McCloy, LLP
> 601 South Figueroa Street, 30th Floor
> Los Angeles, CA 90017-5735
> Telephone: (213) 892-4000
> Facsimile: (213) 629-5063
> E-mail: tkreller@milbank.com
> Attn: Thomas R. Kreller, Esq.

## C.    The Best Interest Test And Feasibility Of The Plan.

For the Plan to be confirmed, the Plan must satisfy the requirements of Section 1129 of the Bankruptcy Code, including the requirements discussed below.

### 1.    Best Interest of Creditors.

Pursuant to Section 1129(a)(7) of the Bankruptcy Code, for the Plan to be confirmed, it must provide that Creditors and Holders of Allowed Claims or Allowed Equity Interests will receive at least as much under the Plan as they would receive in a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code (the "Best Interest Test"). The Best Interest Test with respect to each Impaired Class requires that each Holder of an Allowed Claim or Allowed Equity Interest in such Class either: (i) accepts the Plan; or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under Chapter 7. The Bankruptcy Court will determine whether the value to be received under the Plan by the Holders of Allowed Claims in each Class of Creditors or Holders of Allowed Equity Interests equals or exceeds the value that would be allocated to such Holders in a liquidation under Chapter 7. The Debtors believe that the Plan meets the Best Interest Test and provides value which is not less than what would be recovered by each Holder of an Impaired Claim or Impaired Equity Interest in Class 3, Class 5, Class 6, Class 7 and Class 8 in a Chapter 7 proceeding for each of the Debtors.

### 2.    Valuation.

#### a.    Introduction.

In connection with certain matters relating to the Plan, the Debtors directed Goldman, Sachs & Co. ("Goldman Sachs") to prepare a reorganization valuation analysis of the Debtors on

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

127

1   a going concern basis.  The valuation analysis was prepared by Goldman Sachs based on data,

2   information (including the Financial Projections) and financial and market conditions as of July

3   14, 2009 (the "Valuation Analysis") and Goldman Sachs did not undertake, and has no

4   responsibility to update, revise or reaffirm the Valuation Analysis, including without limitation,

5   as a result of data, circumstances, developments, events, or any subsequent changes or

6   modifications to any existing rules or regulations instituted by any gaming or other similar

7   regulatory authority, occurring after such date.

8          On or about June 15, 2009, the Debtors filed with the Bankruptcy Court a certain

9   Proposed Disclosure Statement to Accompany Debtors' Joint Plan of Reorganization [Docket

10  No. 468] (the "June 15 Disclosure Statement").  The June 15 Disclosure Statement erroneously

11  stated that the valuation summary contained therein was a summary of the results of a valuation

12  analysis performed by Goldman Sachs.  Accordingly, the valuation analysis in the June 15

13  Disclosure Statement should not be relied upon in evaluating the Plan.  Rather, the following

14  represents a summary of Goldman Sachs' Valuation Analysis.

15         In preparing the Valuation Analysis, Goldman Sachs has, among other things: (i)

16  reviewed certain internal financial and operating data of the Debtors; (ii) discussed with certain

17  senior executives of the Debtors the current operations and prospects of the Debtors; (iii)

18  reviewed certain operating and financial forecasts prepared by the Debtors, including the

19  Projections; (iv) discussed with certain senior executives of the Debtors key assumptions related

20  to the Projections; (v) prepared discounted cash flow analyses based on the Projections, utilizing

21  various discount rates and terminal value multiples; (vi) considered the prevailing trading

22  multiples of certain publicly-traded companies in businesses reasonably comparable to the

23  Debtors; (vii) considered the multiples in recent change-of-control transactions involving public

24  companies in businesses Goldman Sachs deemed to be reasonably comparable to the Debtors;

25  and (viii) considered such other factors as Goldman Sachs deemed appropriate under the

26  circumstances.

27         Goldman Sachs has not conducted any independent evaluation or appraisal of the

28  respective assets or liabilities of the Debtors or any other party.  Goldman Sachs relied upon and

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2                              128

1   assumed, without independent verification, the accuracy and completeness of the financial,

2   accounting, tax and other information provided to or discussed with it by the Debtors or obtained

3   by it from public sources.   Goldman Sachs has not assumed any responsibility for the

4   independent verification of any such information, including, without limitation, the Projections,

5   and has further relied upon the assurances of the senior management of the Debtors that they are

6   unaware of any facts that would make the information and Projections incomplete or misleading

7   in any respect.   Goldman Sachs has not audited, reviewed or compiled the accompanying

8   information in accordance with Generally Accepted Accounting Principles or otherwise.  With

9   respect to the Projections furnished by the Debtors, Goldman Sachs has assumed that such

10   Projections have been reasonably prepared and reflect the best currently available estimates and

11   judgments of the senior management of the Debtors as to the expected future performance of the

12   Debtors.

13        In preparing the Valuation Analysis, Goldman Sachs relied upon the Projections and the

14   assumptions upon which the Projections were prepared, including: (i) the Effective Date occurs

15   on or about September 30, 2009; (ii) the Debtors are able to recapitalize and have adequate

16   liquidity as of the Effective Date, as set forth in the Projections; (iii) the Debtors are able to

17   implement the Plan in the manner described herein; (iv) the debt level of the Debtors will be

18   approximately $350 million , immediately following the Effective Date; (v) the Debtors will not

19   have significant NOLs available to offset future taxable income as of the Effective Date; (vi) the

20   applicable income tax rate will be 35 (%) percent for the Debtors; and (vii) general financial and

21   market conditions and the financial and market outlook specifically for the gaming industry in

22   which the Debtors operate as of the Effective Date will not differ, in any way meaningful to

23   Goldman Sachs' analysis, from the conditions prevailing as of July 14, 2009, the date of

24   Goldman Sachs' Valuation Analysis.

25        Goldman Sachs has employed generally accepted valuation techniques in estimating the

26   range of respective total enterprise value ("TEV").  Goldman Sachs primarily relied upon a sum

27   of the parts ("Sum of the Parts") analysis to value the Debtors.  Goldman Sachs also utilized a

28   discounted cash flow ("DCF") analysis, a Comparable Public Company Analysis, and a

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

129

1   transaction comparable analysis ("Transaction Comparable Analysis") to value the Debtors.

2   Goldman Sachs believes that these valuation methodologies reflect both the market's current

3   view, as well as a longer term focus, on the value of the Debtors.

4               b.      Sum of the Parts Analysis

5       A Sum of the Parts analysis was the primary methodology used to determine the TEV of

6   the Debtors.  In a Sum of the Parts analysis, each of the subject company's lines of business

7   and/or locations are valued based on the Comparable Public Company Analysis methodology, as

8   described below.  The values of the regional locations of the Debtors' casino properties and slot

9   route business, offset by the implied negative value of the percentage of general and

10  administrative expenses, at the blended EBITDA multiple, were then added to determine TEV.

11  In performing the Sum of the Parts Analysis, Goldman Sachs relied upon the Projections and

12  various publicly available analyst reports relating to the current and projected operating

13  performance, including projected EBITDA, of the comparable public companies.

14              c.      DCF Analysis

15      Goldman Sachs also utilized a DCF analysis to determine the TEV of the Debtors.  The

16  discounted cash flow of an enterprise represents the present value of unleveraged, after-tax cash

17  flows available to all providers of capital using an appropriate set of discount rates.  The DCF

18  analysis takes into account the projected operating cash flows of the subject company by using

19  company projections as the basis for the financial model.  The underlying concept of the DCF

20  analysis is that debt-free, after-tax cash flows are estimated for a projection period and a terminal

21  value is estimated to determine the going concern value of the subject company at the end of the

22  projection period.  These cash flows and terminal value are then discounted at an assumed

23  weighted average cost of capital, which is determined pursuant to the capital asset pricing model

24  (the "CAPM"), a financial theory which assumes a linear relationship between risk and return,

25  widely used in estimating cost of capital for DCF valuation purposes.

26      In performing the calculation, Goldman Sachs made assumptions both for the weighted

27  average cost of capital (the "WACC"), which is used to value future cash flows based on the risk

28  of the projections, and the EBITDA exit multiple and terminal cash flow perpetual growth rates,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2                                130

1    which are used to determine the future value of the enterprise after the end of the projection

2    period. In performing this WACC analysis, Goldman Sachs used a range of discount rates (the

3    "Discount Rates") that reflect a number of company and market-specific factors utilized under

4    the CAPM, including business execution risk and the nature and derivation of the Projections, as

5    well as the cost of equity and current cost of debt at the target capitalization for companies that

6    Goldman Sachs deemed comparable. Goldman Sachs used a range of Discount Rates between

7    11.0% and 15.0% for the Debtors and assumed a debt to capitalization rate of 60% in accordance

8    with the Projections.

9                     d.        Comparable Public Company Analysis

10        In a Comparable Public Company Analysis, a subject company is valued by comparing it

11    with selected publicly held companies in reasonably similar lines of business. The comparable

12    public companies are chosen based on, among other attributes and factors, their similarity to the

13    subject company's size, profitability and market presence. The price that investors are willing to

14    pay in the public markets for each company's publicly traded securities represents the market's

15    value of that company's current and future prospects as well as the rate of return required on the

16    investment.

17        In selecting comparable public companies, Goldman Sachs considered multiple factors,

18    including, among other things, the focus of the comparable companies' businesses as well as

19    such companies' current and projected operating performance. Numerous financial multiples

20    and ratios were developed to measure each company's valuation and relative performance.

21    Some of the specific analyses entailed comparing the enterprise value (defined as market value

22    of equity plus market value of debt, market value of preferred stock and minority interest minus

23    excess cash) for each of the comparable public companies to their projected EBITDA. These

24    multiples were calculated and were then applied to the Projections to determine the range of

25    enterprise value and equity value using this methodology. In performing the Comparable Public

26    Company Analysis, Goldman Sachs relied upon the Projections as they relate to the Debtors and

27    various publicly available analyst reports relating to the current and projected operating

28    performance, including projected EBITDA, of the comparable public companies.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

131

1          e.      Transaction Comparable Analysis

2          Goldman Sachs also utilized a Transaction Comparable Analysis to determine the TEV of

3    the Debtors.   The Transaction Comparable Analysis approach entails calculating EBITDA

4    multiples based upon implied values (including any debt assumed and equity purchased) in

5    change of control transactions of companies determined to be similar to a particular subject

6    company.  These multiples are then applied to the subject company projections to determine an

7    implied range of enterprise values.   In performing the Transaction Comparable Analysis,

8    Goldman Sachs evaluated various public merger and acquisition and restructuring transactions

9    that have occurred in the gaming industry over the past several months.

10         f.      Valuation Summary

11         As a result of such analyses, review, discussions, considerations and assumptions (all as

12   of July 14, 2009), Goldman Sachs provided to the Debtors an estimate that, as of the Effective

13   Date, the TEV range (the "TEV Range") of the Debtors is approximately $500.0 million to

14   $600.0 million.

15         The above estimated TEV Range represents hypothetical value that reflect the estimated

16   intrinsic values of the Debtors derived through the application of the above-described valuation

17   methodologies.  Goldman Sachs' estimates are based on economic, market, financial and other

18   conditions as they existed, and on the information made available to Goldman Sachs, as of July

19   14, 2009.

20         The summary set forth above does not purport to be a complete description of the

21   Valuation Analysis performed by Goldman Sachs.  The preparation of an estimated TEV Range

22   involves various determinations as to the most appropriate and relevant methods of financial

23   analysis and the application of these methods in the particular circumstances and, therefore, such

24   an estimate is not readily susceptible to summary description.   The value of an operating

25   business is subject to uncertainties and contingencies that are difficult to predict and will

26   fluctuate with changes in factors affecting the financial results, financial condition and prospects

27   of such a business.  As a result, any estimates of TEV Range set forth herein are not necessarily

28   indicative of actual outcomes.   In addition, estimates of TEV Range do not purport to be

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2                                              132

1  appraisals, nor do they necessarily reflect the values that might be realized if assets were sold.

2  The estimates prepared by Goldman Sachs assume that, upon confirmation of the Plan and

3  occurrence of the Effective Date, the Reorganized Debtors and their subsidiaries will own and

4  operate all, or substantially all, of the Debtors' businesses and assets and will continue as the

5  owners and operators of such businesses and assets.  Depending on the results of such operations

6  or changes in the financial markets, actual TEV and/or actual equity value may differ

7  significantly from Goldman Sachs' Valuation Analysis set forth herein.

8      **3.**    **Liquidation Analysis.**

9      The Liquidation Analysis attached as <u>Exhibit B</u> hereto summarizes the Debtors' best

10  estimate of recoveries by Creditors and Holders of Allowed Equity Interests in the event of

11  liquidation of the Debtors as of December 31, 2009.

12      Generally, to determine what Holders of Allowed Claims and Allowed Equity Interests in

13  each Impaired Class would receive if the Debtors were liquidated, the Bankruptcy Court must

14  determine what funds would be generated from the liquidation of the Debtors' Assets and

15  properties in the context of a Chapter 7 liquidation case for each Debtor, which for unsecured

16  Creditors would consist of the proceeds from the disposition of the Assets of each of the Debtors,

17  augmented by the unencumbered Cash held by each of the Debtors at the time of commencement

18  of the Chapter 7 cases.  Such Cash amounts would be reduced by the costs and expenses of the

19  liquidation and by such additional Administrative Claims and Other Priority Claims as may

20  result from the termination of the Debtors' businesses in each of the Chapter 7 cases and the use

21  of Chapter 7 for the purpose of liquidation.[40]

22      In a Chapter 7 liquidation, Holders of Allowed Claims would receive distributions based

23  on the liquidation of the non-exempt assets of a Debtor.  There are no exempt assets in these

24  cases, and, as such, would include the same Assets being collected and liquidated under the Plan-

25  -the interests of the Debtors in Cash, the Assets and the Litigation Claims.  However, the

26

[40] While the Administrative Agent and Holders of the Senior Credit Facility Claims (as well as the Holders of the
27  Senior Subordinated Note Claims) are owed by all of the Debtors jointly and severally, the Holders of Allowed General Unsecured Claims must look to the particular Debtors who are obligated on their Claims for recovery.  As
28  the Liquidation Analysis indicates, there is a wide variance in available Assets among the various Debtors.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

133

1   proceeds from the collection and sale of property of the Estates available for distribution to

2   Creditors would be reduced by the satisfaction of any liens and security interests in the Assets,

3   costs of sale, any commission payable to the Chapter 7 trustee, the trustee's attorneys' and

4   accounting fees, as well as the administrative costs of the Chapter 7 estate. In a Chapter 7 case,

5   the Chapter 7 trustee would be entitled to seek a sliding-scale commission based upon the funds

6   distributed by such trustee to secured creditors.

7       The Debtors are licensed for various forms of gaming operations in three states. In the

8   event of a conversion to Chapter 7, the trustee(s) and the Debtors may not be allowed to continue

9   gaming operations, given the change in management which would occur with the appointment of

10  one or more Chapter 7 trustees. What may be the most important assumption underlying both

11  the Liquidation Analysis and the Valuation Analysis is that the Debtors continue their gaming

12  operations. Any cessation or interruption of these operations will have a material impact upon

13  the value of the Assets and the proceeds which will then be obtained from the liquidation of the

14  Assets.

15      Administrative Claims that may arise in Chapter 7 cases or result from the Chapter 11

16  Cases would be paid in full from the liquidation proceeds before the balance of those proceeds

17  would be made available to pay unclassified Claims, Allowed Other Priority Claims, Allowed

18  Other Secured Claims, Allowed Senior Credit Facility Claims, Allowed General Unsecured

19  Claims, Allowed Intercompany Claims and Allowed Intercompany Interests in each Chapter 7

20  case.

21      In addition, the Debtors are doubtful that a Chapter 7 trustee in each Chapter 7 case

22  would pursue any Litigation Claims as vigorously as the Reorganized Debtors, or be able to

23  identify the Litigation Claims that are cost-effective to pursue as prudently as the Reorganized

24  Debtors who have the benefit of the knowledge and information that they previously obtained.

25      The distributions from the liquidation proceeds would be paid Pro Rata according to the

26  amount of the aggregate Claims held by each Creditor in each Chapter 7 case in accordance with

27  the distribution scheme of the Bankruptcy Code. The Debtors believe that the most likely

28  outcome under Chapter 7 would be the application of the "absolute priority rule." Under that

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

134

1   rule, no junior Creditor in a Chapter 7 case may receive any distribution until all senior Creditors

2   are paid in full, with interest, and no Holder of an Equity Interest may receive any distribution

3   until all Creditors are paid in full.

4       The Debtors have determined that Confirmation will provide each Creditor and Holder of

5   an Allowed Equity Interest with no less of a recovery than it would receive if each of the

6   Debtors were liquidated under Chapter 7.  In liquidation under Chapter 7, as set forth for each of

7   the Debtors in the Liquidation Analysis, the recoveries for Priority Claims, Administrative

8   Claims, Senior Credit Facility Claims, Other Secured Claims and General Unsecured Claims

9   would vary, but would not exceed the projected recoveries under the Plan.  Holders of Equity

10  Interests in Herbst Gaming, Holders of Senior Subordinated Note Claims and Holders of Section

11  726(a)(4) Claims would receive nothing in a Chapter 7 liquidation or under the Plan.

12      **4.**    **Feasibility.**

13      The Bankruptcy Code requires that in order to confirm the Plan, the Bankruptcy Court

14  must find that Confirmation is not likely to be followed by liquidation or the need for further

15  financial reorganization of the Debtors (the "Feasibility Test").  For the Plan to meet the

16  Feasibility Test, the Bankruptcy Court must find that the Reorganized Debtors will possess the

17  resources and working capital necessary to meet their obligations under the Plan.

18      To demonstrate the feasibility of the Plan, the Debtors have prepared projections (the

19  Financial Projections") for the operation of the Debtors' businesses for the period of 2009

20  through 2015.  The Financial Projections are attached hereto as Exhibit D.  The projections

21  demonstrate that the Debtors are capable of satisfying the obligations proposed under the Plan,

22  including the payment of debt service on the $350,000,000 due under the Herbst Gaming Senor

23  Loan as well as the amounts due to holders of Allowed General Unsecured Claims.

24      In addition, as can be seen from the financial reports of the Debtors since the Petition

25  Date through July 3, 2009, a summary of which is included as Exhibit E (the "Cash Receipt and

26  Usage") the Debtors have generated revenues and incurred expenses as anticipated, and had Cash

27  on hand of $112,656,000. vs. a projected Cash on hand of $110,438,000.  As provided for in the

28  extended Cash Collateral Stipulation Budget for the period from June 20 through September 18,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

135

1    2009, which is also included as part of Exhibit E, Cash on hand is projected to be $111,021,000.

2    As such, the Debtors are capable of meeting all Cash demands under the Plan.

3    THE ABOVE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD

4    COMPLIANCE WITH THE GUIDELINES OF THE AMERICAN INSTITUTE OF

5    CERTIFIED PUBLIC ACCOUNTANTS, THE PRACTICES RECOGNIZED TO BE IN

6    ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, OR THE

7    RULES   AND   REGULATIONS   OF   THE   SEC   REGARDING   PROJECTIONS.

8    FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED BY INDEPENDENT

9    ACCOUNTANTS.   ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE

10   PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH

11   IN THE PAST HAVE NOT BEEN ACHIEVED AND WHICH MAY NOT BE REALIZED IN

12   THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND

13   COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE

14   BEYOND THE CONTROL OF THE DEBTORS.  CONSEQUENTLY, THE PROJECTIONS

15   SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY THAT THE

16   PROJECTIONS WILL BE REALIZED.  ACTUAL RESULTS MAY VARY MATERIALLY

17   FROM THOSE PRESENTED IN THE PROJECTIONS.

18   At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan

19   satisfies the statutory requirements for Confirmation.

20   **5.    Confirmation of the Plan without Acceptance by all Impaired Classes:  the "Cramdown" Alternative**

21

22   Section 1129(b) of the Bankruptcy Code provides that a plan of reorganization may be

23   confirmed even if it has not been accepted by all Impaired classes, as long as at least one

24   Impaired class of claims has accepted it.  Consequently, the Bankruptcy Court may confirm the

25   Plan at the Debtors' request notwithstanding the Plan's rejection by Impaired Classes, as long as

26   at least one Impaired Class has accepted the Plan and the Plan "does not discriminate unfairly"

27   and is "fair and equitable" as to each Impaired Class that has not accepted it.

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

136

A plan will be deemed not to discriminate unfairly under the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan will be deemed fair and equitable as to a class of secured claims that rejects the plan if the plan provides (i)(a) that the holders of claims in the rejecting class retain the lien securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim in such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim of a value, as of the effective date of the plan, at least equal to the value of the holder's interest in the estate's interest in such property; (ii) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on such proceeds as described under clause (i) or (ii) of this paragraph; or (iii) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides (w) for each holder of a claim included in the rejecting class to receive or retain on account of such claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim or (x) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides that (y) each holder of an interest included in the rejecting class receives or retains on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest or (z) the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

The votes of Holders of Claims and Equity Interests under Class 5, Class 6, Class 8, and

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

137

1  Class 9 are not being solicited because such Holders are not entitled to receive or retain under the

2  Plan any interest or property on account of their respective Claims or Equity Interests.  Such

3  Classes therefore are deemed to have rejected the Plan.  The Debtors are seeking confirmation of

4  the Plan pursuant to Section 1129(b) of the Bankruptcy Code with respect to Class 5, Class 6,

5  Class 8, and Class 9, notwithstanding such Classes' deemed rejection of the Plan.  The Debtors

6  also may seek confirmation as to other Classes that reject the Plan.  Notwithstanding the deemed

7  rejection of the Plan by Class 5, Class 6, Class 8 and Class 9, the Debtors believe that, under all

8  of the relevant facts and circumstances, Class 5, Class 6, Class 8 and Class 9 are being treated

9  fairly and equitably under the Bankruptcy Code.  The Debtors therefore believe the Plan may be

10  confirmed despite its deemed rejection by those Classes.

11    **6.    Accepting Impaired Class.**

12    Since at least one Class of Claims is Impaired under the Plan, in order for the Plan to be

13  confirmed, the Plan must be accepted by at least one Impaired Class of Claims (not including the

14  votes of insiders of any Debtor).

15    **7.    Acceptance of the Plan.**

16    For an impaired Class of Claims to accept the Plan, those representing at least two-thirds

17  in amount and a majority in number of the Allowed Claims voted in that Class must be cast for

18  acceptance of the Plan.

19    **8.    Allowed Claims.**

20    You have an Allowed Claim if:  (i) you or your representative timely files a proof of

21  Claim and no objection has been filed to your Claim within the time period set for the filing of

22  such objections; (ii) you or your representative timely files a proof of Claim and an objection

23  was filed to your Claim upon which the Bankruptcy Court has ruled and allowed your Claim;

24  (iii) your Claim is listed by any of the Debtors in their respective Schedules or any amendments

25  thereto (which are on file with the Bankruptcy Court as a public record) as liquidated in amount

26  and undisputed and no objection has been filed to your Claim; or (iv) your Claim is listed by any

27  Debtor in its Schedules as liquidated in amount and undisputed and an objection was filed to

28  your Claim upon which the Bankruptcy Court has ruled to allow your Claim.  Under the Plan,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2      138

1    the deadline for filing objections to Claims is 90 days following the Effective Date. If your

2    Claim is not an Allowed Claim, it is a Disputed Claim and you will not be entitled to vote on the

3    Plan unless the Bankruptcy Court temporarily or provisionally allows your Claim for voting

4    purposes pursuant to Bankruptcy Rule 3018. If you are uncertain as to the status of your Claim

5    or Equity Interest or if you have a dispute with any Debtor, you should check the Bankruptcy

6    Court record carefully, including the Schedules of each Debtor, and seek appropriate legal

7    advice. Neither the Debtors nor their professionals can advise you about such matters.

8         **9.    Impaired Claims and Impaired Equity Interests.**

9         Impaired Claims and Impaired Equity Interests include those whose legal, equitable or

10   contractual rights are altered by the Plan, even if the alteration is beneficial to the Creditor or

11   Holder of the Equity Interest, or if the full amount of the Allowed Claims will not be paid under

12   the Plan. Holders of Claims which are not Impaired under the Plan will be deemed to have

13   accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code, and the Debtors need not

14   solicit acceptance of the Plan by Holders of such Unimpaired Claims. Holders of Claims or

15   Equity Interests which are to receive nothing under the Plan will be deemed to have voted to

16   reject the Plan. Consequently, only Impaired Holders of Claims in Class 3 and Class 7 are

17   entitled to vote on the Plan.

18        **10.   Voting Procedures.**

19             a.    Submission of Ballots.

20        All Creditors entitled to vote will be sent a ballot, together with instructions for voting, a

21   copy of this approved Disclosure Statement and a copy of the Plan. You should read the ballot

22   carefully and follow the instructions contained therein. Please use only the ballot that was sent

23   with this Disclosure Statement.

24        You should complete your ballot and return it as follows:

25             Gordon Silver
               Attn: Matthew C. Zirzow, Esq.

26             3960 Howard Hughes Parkway, 9th Floor
               Las Vegas, NV 89169

27             Telephone: (702) 796-5555
               Facsimile: (702) 369-2666

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2                                            139

1    **TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE ADDRESS**

2    **LISTED ABOVE BY 5:00 P.M., PACIFIC DAYLIGHT TIME, ON SEPTEMBER 15,**

3    **2009.**

4            b.    <u>Incomplete Ballots.</u>

5        Unless otherwise ordered by the Bankruptcy Court, ballots which are signed, dated and

6    timely received, but on which a vote to accept or reject the Plan has not been indicated, will be

7    counted as a vote for the Plan.

8            c.    <u>Withdrawal of Ballots.</u>

9        A ballot may not be withdrawn or changed after it is cast unless the Bankruptcy Court

10   permits you to do so after notice and a hearing to determine whether sufficient cause exists to

11   permit the withdrawal or change.

12           d.    <u>Questions and Lost or Damaged Ballots.</u>

13       If you have questions concerning these voting procedures, if your ballot is damaged or

14   lost, or if you believe you should have received a ballot but did not receive one, you may contact:

15                   Gordon Silver
                Attn: Matthew C. Zirzow, Esq.

16                   3960 Howard Hughes Parkway, 9th Floor
                Las Vegas, NV 89169

17                   Telephone:  (702) 796-5555
                Facsimile:  (702) 369-2666

18                   E-mail: mzirzow@gordonsilver.com

19                          **XVII.**
                  **<u>MISCELLANEOUS</u>**

20

21   A.    **<u>Post-Effective Date Objections to Claims or Equity Interests.</u>**

22       After the Effective Date, objections to Claims or Equity Interests will be made and

23   objections to Claims and Equity Interests made previous thereto will be pursued by the

24   Reorganized Debtors, Reorganized Herbst Gaming or any other party properly entitled to do so

25   after notice to the Reorganized Debtors and Reorganized Herbst Gaming and approval by the

26   Bankruptcy Court.  Any objections to Claims made after the Effective Date must be filed and

27   served not later than 120 days after the Effective Date, unless such period is extended by order of

28   the Bankruptcy Court for good cause shown.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

140

**B.    Resolution of Objections After Effective Date; Distributions.**

    **1.    Resolution of Objections.**

From and after the Effective Date, the Reorganized Debtors and Reorganized Herbst Gaming may litigate to judgment, propose settlements of, or withdraw objections to, all pending or filed Disputed Claims and Disputed Equity Interests and may settle or compromise any Disputed Claim or Disputed Equity Interest without notice and a hearing and without approval of the Bankruptcy Court.

    **2.    Distributions.**

Within 30 days after the Bar Date, Debtors shall determine which Claims are Disputed Claims for purposes of the Disputed Claim Reserve. Debtors shall send written notice to holders of such Disputed Claims stating that such Claims or Equity Interests are disputed and setting forth the amount, if any, that Debtors intend to deposit into the Disputed Claim Reserve on account of such Disputed Claim. As of the Effective Date, Debtors shall establish a separate, segregated bank account for purposes of funding the Disputed Claim Reserve, and such property shall be held by Debtors or Reorganized Debtors in trust for the benefit of the holders of Disputed Claims. If any holder of a Disputed Claim disagrees with the proposed amount and is unable to reach an agreement with Debtors or Reorganized Debtors on the amount to be deposited or held, the holder of the Disputed Claim may petition the Bankruptcy Court to fix the amount after notice and hearing.

Upon Final Order with respect to a Disputed Claim or Disputed Equity Interest, the Holder of such Disputed Claim or Disputed Equity Interest, to the extent it has been determined to hold an Allowed Claim or Allowed Equity Interest, will receive from the applicable Reorganized Debtor or Reorganized Herbst Gaming that payment or Distribution to which it would have been entitled if the portion of the Claim or Equity Interest so allowed had been allowed as of the Effective Date. Such payment or Distribution will be made as soon as practical after the order allowing the Claim or Equity Interest has become a Final Order.

    **3.    Late-Filed Claims.**

No Claim filed after the Bar Date or, as applicable, the Administrative Claim Bar Date,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

141

1 will be allowed.  After the Bar Date or the Administrative Claim Bar Date, as applicable, no

2 Creditor will be permitted to amend any Claim to increase the claimed amount.

3    **4. Effectuating Documents; Further Transactions; Timing.**

4    Each officer of any Debtor or Reorganized Debtor will be authorized to execute, deliver,

5 file or record such contracts, instruments, releases and other agreements or documents and to

6 take such actions as may be necessary or appropriate to effectuate and further evidence the terms

7 and conditions of the Plan and any Interests issued, transferred or canceled pursuant to the Plan.

8 All transactions that are required to occur on the Effective Date under the terms of the Plan will

9 be deemed to have occurred simultaneously.  The Debtors and Reorganized Debtors are

10 authorized and directed to do such acts and execute such documents as are necessary to

11 implement the Plan.

12    **5. Exemption from Transfer Taxes.**

13    Pursuant to Section 1146(a) of the Bankruptcy Code, the (i) issuance, distribution,

14 transfer or exchange of Estate property; (ii) creation, modification, consolidation or recording of

15 any deed of trust or other interest, the securing of additional indebtedness by, in furtherance of,

16 or in connection with, the Plan or the Confirmation Order; (iii) making, assignment, modification

17 or recording of any lease or sublease; or (iv) making, delivery or recording of a deed or other

18 instrument of transfer under, in furtherance of, or in connection with, the Plan, Confirmation

19 Order or any transaction contemplated above, or any transactions arising out of, contemplated by

20 or in any way related to the foregoing will not be subject to any document recording tax, stamp

21 tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act or real estate transfer tax,

22 mortgage recording tax or other similar tax or governmental assessment.

23    **6. Revocation or Withdrawal of the Plan.**

24    The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation

25 Date.  If the Plan is withdrawn or revoked or if the Bankruptcy Court denies confirmation of the

26 Plan, then the Plan will be null and void and nothing contained in the Plan will constitute a

27 waiver or release of any Claims nor will such withdrawal or revocation prejudice the rights of

28 any Debtor or any other Person in any further proceedings involving any Debtors.  If the Plan is

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

142

1 withdrawn or revoked or if the Bankruptcy Court denies confirmation of the Plan, nothing in the
2 Plan will be deemed an admission of any sort.

3     If the Substantial Consummation Date does not occur within one year following the
4 Effective Date, then upon notification submitted by the Debtors to the Bankruptcy Court: (i) the
5 Confirmation Order will be vacated, (ii) no additional Distributions under the Plan will be made,
6 (iii) the Debtors and all Holders of Claims will be restored to the status quo ante as of the day
7 immediately preceding the Confirmation Date as though the Confirmation Date had never
8 occurred, and (iv) the Debtors' obligations with respect to the Claims will remain unchanged
9 (except to the extent of any post-Effective Date payments), and nothing in the Plan will (y)
10 constitute or be deemed a waiver or release of any Claims by or against the Debtors or any other
11 Person or (z) prejudice the rights of the Debtors or any Person in any further proceedings
12 involving the Debtors.

13     **7.    Binding Effect.**

14     The Plan will be binding upon, and will inure to the benefit of, the Debtors and their
15 Estates, the Reorganized Debtors, Reorganized Herbst Gaming and Holders of all Claims and
16 Equity Interests, and their respective successors and assigns.

17     **8.    Governing Law.**

18     Except to the extent that the Bankruptcy Code or other federal law is applicable or as
19 provided in any contract, instrument, release or other agreement entered into in connection with
20 the Plan or in any document which remains unaltered by the Plan, the rights, duties and
21 obligations of the Debtors and any other Person arising under the Plan will be governed by the
22 internal laws of the State of Nevada without giving effect to Nevada's choice of law provisions.

23     **9.    Modification of Payment Terms.**

24     The Reorganized Debtors and Reorganized Herbst Gaming reserve the right to modify
25 the treatment of any Allowed Claim or Allowed Equity Interest in any manner adverse only to
26 the Holder of such Allowed Claim or Allowed Equity Interest at any time after the Effective
27 Date upon the prior written consent of that Holder whose Allowed Claim or Allowed Equity
28 Interest is being adversely affected.

143

101323-003/716183v.2

**10.**     **Allocation of Plan Distributions Between Principal and Interest.**

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for income tax purposes to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

**11.**     **Means of Cash Payment.**

Payments of Cash pursuant to the Plan will be in U.S. dollars and will be made, in the sole discretion of the Debtors or Reorganized Debtors and Reorganized Herbst Gaming, as the case may be, by (i) checks drawn on, or (ii) wire transfer from, a domestic bank selected by the Debtors, Reorganized Debtors or Reorganized Herbst Gaming, as the case may be. Cash payments to foreign creditors may be made, at the option of such Debtors, Reorganized Debtors, or Reorganized Herbst Gaming in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**12.**     **Providing for Claims Payments.**

Distributions to Holders of Allowed Claims will be made by the Debtors, Reorganized Debtors or Reorganized Herbst Gaming, as the case may be: (i) at the addresses set forth on the proofs of Claim filed by such Holders (or at the last known addresses of such Holders if no proof of Claim is filed or if the Debtors have been notified of a change of address); (ii) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related proof of Claim; or (iii) at the addresses reflected in the Schedules if no proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address. Distributions to Holders of Allowed Equity Interests will be made to such Holders as of the Record Date. If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder will be made unless and until the Disbursing Agent is notified of such Holder's then-current address, at which time all missed Distributions will be made to such Holder without interest. Amounts in respect of undeliverable Distributions made through the Disbursing Agent will be returned to the Debtors, Reorganized Debtors or Reorganized Herbst

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

144

1  Gaming, as applicable, until such Distributions are claimed.  All claims for undeliverable

2  Distributions must be made on or before the second anniversary of the Effective Date.  After

3  such date, all unclaimed property will revert to the Debtors, Reorganized Debtors and

4  Reorganized Herbst Gaming, as applicable, and the Claim of any Holder or successor to such

5  Holder with respect to such property will be discharged and forever barred notwithstanding any

6  federal or state escheat laws to the contrary.  Nothing in the Plan will require the Debtors, the

7  Reorganized Debtors, Reorganized Herbst Gaming or the Disbursing Agent to attempt to locate

8  any Holder of an Allowed Claim or Allowed Equity Interest.

9       **13.**   **Set-Offs.**

10       The Debtors and Reorganized Debtors may, but will not be required to, set off or recoup

11  against any Claim or Equity Interest and the payments or other Distributions to be made pursuant

12  to the Plan in respect of such Claim or Equity Interest (before any Distribution is made on

13  account of such Claim or Equity Interest), claims of any nature whatsoever that the applicable

14  Debtors or Reorganized Debtors may have against the Holder of such Claim or Equity Interest,

15  to the extent such Claims or Equity Interests may be set off or recouped under applicable law.

16  However, neither the failure to do so nor the allowance of any Claim or Equity Interest under the

17  Plan will constitute a waiver or release by the Debtors or Reorganized Debtors of any such Claim

18  that they may have against such Holder.

19       **14.**   **Notices.**

20       Any notice required or permitted to be given under the Plan must be in writing and served

21  by either: (i) certified mail, return receipt requested, postage prepaid; (ii) hand delivery; or (iii)

22  reputable overnight courier service, freight prepaid, to be addressed as follows:

23  If to the Debtors:                      Herbst Gaming, Inc.

Attn: Sean T. Higgins, Esq., General Counsel

3440 W. Russell Road

Las Vegas, NV 89118

Tel:  (702) 889-7600

Fax:  (702) 252-4138

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

145

With a copy to:                          Gordon Silver
                                         Attn: Gerald M. Gordon, Esq.
                                         3960 Howard Hughes Parkway, 9th Floor
                                         Las Vegas, NV 89169
                                         Tel: (702) 796-5555
                                         Fax: (702) 369-2666

If to the Senior Credit Facility Agent:  Wilmington Trust Company
                                         Attn: James A. Hanley
                                         Rodney Square North
                                         1180 North Market Street
                                         Wilmington, De. 19890

With a copy to:                          Milbank, Tweed, Hadley & McCloy, LLP
                                         Attn: Thomas R, Kreller, Esq.
                                         601 South Figueroa Street, 30th Floor
                                         Los Angeles, Ca. 90017-5735
                                         Tel: (213) 892-4000
                                         Fax: (213) 629-5063

**15.    Statutory Committee.**

Any Statutory Committee will terminate on the Effective Date and will thereafter have no further responsibilities in respect of the Chapter 11 Cases, except with respect to the preparation or filing of applications for compensation and reimbursement of expenses.

**16.    Severability.**

If any provision of the Plan is determined by the Bankruptcy Court to be invalid, illegal or unenforceable or the Plan is determined to be not confirmable pursuant to Section 1129 of the Bankruptcy Code, the Bankruptcy Court, at the request of the Debtors, will have the power to alter and interpret such provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the provision held to be invalid, void or unenforceable, and such provision will then be applicable as altered or interpreted. The remainder of the provisions of the Plan will remain in full force and effect and will not be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2                                    146

17.    **Withholding and Reporting Requirements.**

In connection with the Plan and all instruments and Interests issued in connection therewith and Distributions thereunder, the Reorganized Debtors will comply with all withholding and reporting requirements imposed by any taxing authority and all Distributions will be subject to any such withholding and reporting requirements.  The Reorganized Debtors and Reorganized Herbst Gaming will be authorized to take any and all action that may be necessary to comply with such withholding and recording requirements.  Each Holder of an Allowed Claim or Allowed Equity Interest that has received a Distribution will have sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any governmental unit, including income, withholding and other tax obligation on account of such Distribution.

18.    **Cramdown.**

If any Impaired Class is determined to have rejected the Plan in accordance with Section 1126 of the Bankruptcy Code, the Debtors may invoke the provisions of Section 1129(b) of the Bankruptcy Code to satisfy the requirements for Confirmation.  The Debtors reserve the right to modify the Plan to the extent, if any, that Confirmation pursuant to Section 1129(b) of the Bankruptcy Code requires modification.

19.    **Quarterly Fees to the OUST.**

Prior to the Substantial Consummation Date, the Debtors, and after the Substantial Confirmation Date, Reorganized Herbst Gaming, will pay all quarterly fees payable to the OUST after Consummation, consistent with applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

### XVIII.
### ALTERNATIVES TO THE PLAN

The Debtors believe that the Plan provides Creditors and Holders of Equity Interests the best and most complete form of recovery available.  As a result, the Debtors believe that the Plan serves the best interests of all Creditors and parties-in-interest in the Chapter 11 Cases.

In formulating and developing the Plan, the Debtors explored numerous alternatives.  The

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

147

1  Debtors believe not only that the Plan fairly adjusts the rights of various Classes of Creditors

2  and Holders of Equity Interests and enables the Creditors and Holders of Equity Interests to

3  realize the greatest sum possible under the circumstances, but also that rejection of the Plan in

4  favor of some theoretical alternative method of reconciling the Claims and Equity Interests of the

5  various Classes would require, at the very least, an extensive and time-consuming negotiation

6  process and would not result in a better recovery for any Class.  It is not atypical for bankruptcy

7  proceedings involving substantial entities to continue for months or years before a plan of

8  reorganization is consummated and payments are made.

9  **A.    Alternative Plans Of Reorganization.**

10  Under the Bankruptcy Code, a debtor has an exclusive period of 120 days and an

11  additional vote solicitation period of 60 days from the entry of the order for relief during which

12  time, assuming that no trustee has been appointed by the Bankruptcy Court, only a debtor may

13  propose a plan of reorganization.  After the expiration of the initial 180-day period and any

14  extensions thereof, the Debtors or any other party-in-interest may propose a different plan, unless

15  the Bankruptcy Court has extended the exclusivity periods.

16  **B.    Liquidation Under Chapter 7.**

17  If a plan of reorganization cannot be confirmed, the Chapter 11 Cases may be converted

18  to Chapter 7 cases, in which a trustee would be elected or appointed to liquidate the assets of

19  each Debtor for distribution to Creditors and Holders of Equity Interests in accordance with the

20  priorities established by the Bankruptcy Code.  For a discussion of the effect that a Chapter 7

21  liquidation would have on recovery by Creditors, see Section XVI.C., "The Best Interest Test

22  And Feasibility Of The Plan."

23  As previously stated, the Debtors believe that liquidation under Chapter 7 would result in

24  a substantially reduced recovery of funds by the Estates because of:  (i) the risk that some or all

25  of the Debtors may cease or lose business: (ii) additional administrative expenses involved in the

26  appointment of one or more trustees for the Debtors and attorneys and other professionals to

27  assist such trustee(s); and (iii) additional expenses and Claims, some of which would be entitled

28  to priority, which would be generated during the liquidation and from the rejection of leases and

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

148

other executory contracts in connection with a cessation of the Debtors' operations. Accordingly, the Debtors believe that Holders of certain Classes of Claims or Equity Interests will receive substantially smaller distributions in a Chapter 7 liquidation than under the Plan.

## XIX.
## PREFERENCE AND OTHER AVOIDANCE ACTIONS

A bankruptcy trustee (or the entity as a debtor-in-possession) may avoid as a preference a transfer of property made by a debtor to a creditor on account of an antecedent debt while a debtor was insolvent, where that creditor receives more than it would have received in a liquidation of the entity under Chapter 7 had the payment not been made, if (i) the payment was made within 90 days before the date the bankruptcy case was commenced or (ii) the creditor is found to have been an "insider," as defined in the Bankruptcy Code, within one year before the commencement of the bankruptcy case. A debtor is presumed to have been insolvent during the 90 days preceding the commencement of the case.

A bankruptcy trustee (or the entity as a debtor-in-possession) may avoid as a fraudulent transfer a transfer of property made by a debtor within two years (and under applicable Nevada law, four years) before the date the bankruptcy case was commenced if the debtor (i) received less than reasonably equivalent value in exchange for such transfer and (ii) was insolvent on the date of such transfer or became insolvent as a result of such transfer, such transfer left the debtor with an unreasonably small capital, or the debtor intended to incur debts that would be beyond the debtor's ability to pay as such debts matured.

Although the Debtors have not fully analyzed various potential preference or other avoidance actions, it is possible that some prepetition transactions may be avoidable.

As more specifically detailed in Section VII(J) hereinabove, the Committee has asserted in its Standing Motion that it may be granted standing to pursue potential avoidance actions, including fraudulent transfer actions, on behalf of the bankruptcy estate as well. The Committee's proposed avoidance actions, among other potential actions, are detailed more specifically in the Committee Complaint attached to the Standing Motion.

As more specifically detailed in Section VII(I) hereinabove, the Indenture Trustee has

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

149

1  asserted by and through the Indenture Trustee Complaint that it would be a beneficiary to the

2  extent the avoidance actions alleged in the Committee Complaint are successful, among other

3  matters.

4       Debtors and the Senior Credit Facility dispute the Committee's assertions in the Standing

5  Motion and in the proposed Committee Complaint, and also dispute the allegations in the

6  Indenture Trustee Complaint.

7                                    **XX.**
                   **RECOMMENDATION AND CONCLUSION**

8
        The Plan provides the best possible recovery for all parties-in-interest.  Accordingly, the

9  Debtors recommend that all Creditors and Holders of Equity Interests who are entitled to vote on

10  the Plan should vote to accept the Plan.

11       DATED this __7th__ day of August, 2009.

12

13  HERBST GAMING, INC.,                       HGI LAKESIDE, INC.,
    a Nevada corporation                       a Nevada corporation

14
    By: ___/s/Troy D. Herbst___               By: ___/s/Troy D. Herbst___

15

16  CALIFORNIA PROSPECTORS, LTD.,              HGI MARK TWAIN, INC.,
    a Nevada limited liability company         a Nevada corporation

17
18  By: ___/s/Troy D. Herbst___               By: ___/s/Troy D. Herbst___

19
    CARDIVAN COMPANY,                          HGI ST. JO, INC.,
20  a Nevada corporation                       a Nevada corporation

21  By: ___/s/Troy D. Herbst___               By: ___/s/Troy D. Herbst___

22  CORRAL COIN, INC.,                         LAST CHANCE, INC.,
23  a Nevada corporation                       a Nevada corporation

24  By: ___/s/Troy D. Herbst___               By: ___/s/Troy D. Herbst___

25  CORRAL COUNTRY COIN, INC.,                 MARKET GAMING, INC.,
26  a Nevada corporation                       a Nevada corporation

27  By: ___/s/Troy D. Herbst___               By: ___/s/Troy D. Herbst___

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2                                    150

| | |
|---|---|
| DAYTON GAMING, INC.,<br>a Nevada corporation | PLANTATION INVESTMENTS, INC.,<br>a Nevada corporation |
| By: ___/s/Troy D. Herbst_____ | By: ___/s/Troy D. Herbst_____ |
| E-T-T, INC.,<br>a Nevada corporation | THE PRIMADONNA COMPANY, LLC,<br>a Nevada limited liability company |
| By: ___/s/Troy D. Herbst_____ | By: ___/s/Troy D. Herbst_____ |
| E-T-T ENTERPRISES, LLC,<br>a Nevada limited liability company | THE SANDS REGENT,<br>a Nevada corporation |
| By: ___/s/Troy D. Herbst_____ | By: ___/s/Troy D. Herbst_____ |
| FLAMINGO PARADISE GAMING, LLC,<br>a Nevada limited liability company | ZANTE, INC.,<br>a Nevada corporation |
| By: ___/s/Troy D. Herbst_____ | By: ___/s/Troy D. Herbst_____ |

**PREPARED AND SUBMITTED BY:**

GORDON SILVER

By: _____

    GERALD M. GORDON, ESQ.
    THOMAS H. FELL, ESQ.
    MATTHEW C. ZIRZOW, ESQ.
    3960 Howard Hughes Pkwy., 9th Floor
    Las Vegas, Nevada 89169
    Attorneys for Debtors

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

151

1

2

**APPENDIX**

EXHIBIT "A":  PLAN OF REORGANIZATION

EXHIBIT "B":  LIQUIDATION ANALYSIS

EXHIBIT "C":  ORGANIZATIONAL CHART

EXHIBIT "D":  FINANCIAL PROJECTIONS

EXHIBIT "E":   CASH RECEIPT AND USAGE

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101323-003/716183v.2

152